**J. S. D. LANGFORD, Individually and as
Trustee of the Dorothy Sue Langford
Trust, et al., Appellants,**

v.

**C. D. SHAMBURGER, Jr., et al.,
Appellees.**

No. 23818.

United States Court of Appeals
Fifth Circuit.

April 10, 1968.

Rehearing Denied May 16, 1968.

**940**

Kearby Peery, Wichita Falls,.Tex., for appellants.

Harold Jones, Wichita Falls, Tex., Samuel L. Kaplan, Minneapolis, Minn., Ernest Robertson, Howard L. Martin, Spence, Martin & Richie, Nelson, Montgomery & Robertson, Wichita Falls, Tex., for appellees.

Before BROWN, Chief Judge, and BELL and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

This diversity suit for an accounting is a companion to P. P. Langford, III v. C. D. Shamburger, Jr., Individually and as Trustee, 417 S.W.2d 438 (Tex.Civ.App. —Ft. Worth 1967, writ ref'd n.r.e.). Stan and Dorothy Sue Langford, plaintiffs-appellants herein, are brother and sister of P. P. Langford, III, plantiff and successful appellant in state court. All three are grandchildren of C. D. Shamburger, Sr. and his wife Alma Shamburger, both deceased, and are the nephews and niece of C. D. Shamburger, Jr., also deceased, At the time the suits were filed, C. D. Shamburger, Jr. was trustee of each of four cattle trusts established for the grandchildren by their grandfather. He was also independent executor of the estates of his mother and father. The jury in state court reached a verdict in favor of the trustee, but the Ft. Worth Court of Civil Appeals reversed and remanded with directions that the case be retried under legal principles announced in its opinion. The jury in the United States District Court for the Northern District of Texas reached a verdict in favor of plaintiffs-appellants, awarding their respective trusts $8,594.-83. On the ground that each trust was entitled to approximately $52,000 more, they appealed. We reverse and remand, explaining our reasons as we consider the fiduciary breaches allegedly committed by C. D. Shamburger, Sr. and C. D. Shamburger, Jr.

I. Failure of trustees to pay interest on trust funds held in their personal bank accounts.

A. On November 11, 1943, C. D., Sr. created a revocable cattle trust for the benefit of his grandchildren. On December 31, 1946, the 1943 trust was revoked and four separate inter vivos trusts were created, one for each grandchild. C. D., Sr. and C. D., Jr. administered the trusts as co-trustees until C. D., Sr.'s death on December 1, 1955. C. D., Jr. continued as trustee until resigning during the pendency of these lawsuits. The 1946 trusts are irrevocable and are subject to the Texas Trust Act. Tex.Rev.Civ.Stat. Ann. art. 7425b (1960).

Appellants' major objection to the way their trusts have been managed is that the trustees made a practice of keeping large sums of trust money in their personal bank accounts without paying interest. In the years prior to 1952, C. D., Sr. did not have separate bank accounts for the trusts; he simply commingled trust funds with his own and kept records of the amounts belonging to the trusts. Though he set up separate bank accounts for the trusts in 1952, he did not transfer all the trust funds to them at that time but instead left large sums in his own account. At all times, he had an accurate record of the amounts owing to the different trust accounts. When he became sole trustee, C. D., Jr. followed his father's practice by keeping large sums of trust money in accounts established for the estates of his mother and father. Appellants presented exhib-

its showing the sums owed their respective trusts by C. D. Shamburger, Sr., the estate of C. D. Shamburger, Sr., and the estate of Mrs. C. D. Shamburger, Sr. during the years in question and then argued to the court below that as a matter of law each trust was entitled to receive interest on these sums computed at ten per cent per annum, the highest legal rate. Rather than decide the issue as a matter of law, the trial judge submitted interrogatories to the jury, one of which asked whether C. D., Sr., C. D., Jr., or the estates had ever derived a benefit from the use of trust funds. The jury answered in the negative.

When presented with the same question in reference to the P. P. Langford, III trust, the jury in state court absolved the trustees of any liability for commingling trust funds and personal funds or for withholding trust funds from trust bank accounts. While the court of civil appeals was persuaded of the possibility that this jury finding was influenced by the admission of irrelevant and highly prejudicial evidence, it is also possible that the jury was influenced by the presence in the trust instruments of the following exculpatory clause:

> No trustee shall ever be liable for any act of omission or commission unless such act is the result of gross negligence or of bad faith or of the trustee's defalcation, and no trustee shall ever be liable individually for any obligation of the trust.

To the court, however, the exculpatory clause was not determinative. As we must understand and apply that court's decision in this diversity case, it will be necessary to quote from it at considerable length:

> From what our courts [Texas courts] have said, it follows that the question of liability of a defalcating trustee can be ascertained as a matter of law without reference to a jury. The exculpatory language of the trust instrument in this case purporting to relieve the trustee from liability ex-

cept for gross negligence and bad faith cannot be used to excuse the trustee from the misapplication or mishandling of trust funds. Here the trustee borrowed trust funds for his personal benefit and failed to invest substantial sums of trust monies. We think the correct rule of law in this regard is stated in Wichita Royalty Co. v. City Nat. Bank of Wichita Falls, 127 Tex. 158, 89 S.W.2d 394 (1935):

> "The trustee's powers are broad, but no * * * stipulation of the declaration is susceptible of the construction that the trustee is privileged to use the trust property or credit for his own personal benefit. While he is to be held responsible, 'only for his own wilful and corrupt breach of trust and not for any honest error of judgment,' he has no interest in the trust or its property other than a managing interest, and such interest as may be evidenced by a certificate of ownership."

It would be contrary to the public policy of this State to permit the language of a trust instrument to authorize self-dealing by a trustee. Our Texas Act provides:

> "Except as provided in Section 11 of this Act, (Corporate trustee depositing trust funds with self) a corporate trustee shall not lend trust funds to itself or an affiliate * * * ; nor shall any noncorporate trustee lend trust funds to himself, or to his relative, employer, employee, partner, or other business associate." Art. 7425b, § 10, p. 228.

Bogert says:

> "The trustee may violate the duty of loyalty by lending trust funds to himself. He thus brings into play a conflict of private and representative interests. As lender it is his duty to get the best terms possible as to interest, security, and maturity. As debtor his impulse is naturally in the direction of getting the money at the lowest rate and often on other terms not advantageous to the lender. If he lends to himself, he cannot give an impar-

tial judgment as to the adequacy of the security offered. * * *

"If there is no formal loan but a trustee mingles the trust funds with his own and uses them in his private business, the transaction can be treated as a breach of trust on either of two theories, namely, that of conversion of the trust property, or disloyalty." Bogert Trusts and Trustees, 2d Ed. § 543 (J), p. 548.

417 S.W.2d at 444. The import of this section of the opinion is that despite the exculpatory clause, C. D., Sr. and C. D., Jr. committed fiduciary breaches which would make them liable for interest. Under section 10 of the Texas Trust Act, the section quoted with approval from Bogert, and the language in *Wichita Royalty Company*, supra, it is improper for trustees to commingle trust funds with personal funds and to retain large sums of trust money in personal bank accounts even after separate trust bank accounts have been opened. To say nothing of the cases and commentary, both practices fly in the face of the Act's provision against loans of trust funds by a non-corporate trustee to himself.[1]

Had its original opinion been the only one entered by the court of civil appeals in *P. P. Langford, III*, our course of action would be clearly defined: We would hold that as a matter of law it was improper for C. D., Sr. and C. D., Jr., to mingle trust funds with personal funds and to withhold trust funds from trust accounts; the beneficiaries would be entitled to interest on sums of trust money kept in personal bank accounts by C. D., Sr. and in estate accounts by C. D., Jr. However, appellee finds solace in a short opinion written by the court on motion for rehearing and urges that we consider particularly the following:

If the trial court should conclude that fiduciary breaches have occurred, then findings will need to be made as to the accounting aspects of the case. As stated in our original opinion, it appears that the trustee borrowed trust funds for his personal benefit and failed to invest substantial sums of trust moneys. But in view of this record, we are not prepared to so hold as a matter of law and we leave it to the trial court to resolve these questions upon retrial.

417 S.W.2d at 446.[2] He perceives in this language a change of thinking: Whereas the court had originally been positive that the trustees derived a benefit from the borrowing of trust funds, it became so doubtful on motion for rehearing that it directed the trial court to reassess the matter.

The doubt manifested by the court is understandable, contends appellee, because there was no evidence presented in state court, or for that matter in federal court, to prove that the trustees ever benefited from commingling trust funds and personal funds or from withholding trust funds from trust accounts. While these practices were admittedly hazardous, he continues, they could not have resulted in profits to the trustees because accurate records were kept at all times of the amounts owing to the respective trusts. Moreover, the records reflect that the trustees did not use trust funds for their own purposes because the cash balances in C. D., Sr.'s bank accounts and in accounts later opened for the estates never fell below the amounts owing to the respective trusts. That is, while the trus-

---

1. Although the court of civil appeals does not rely on the Restatement (Second) of Trusts (1957), §§ 179 and 180 support the view that it is improper for a trustee to deposit trust funds in his personal bank account. According to § 180, Comment c, "A trustee cannot properly deposit trust money in his personal account." § 179, Comment b is to the same effect.

§ 179, Comment f indicates that a trustee can mingle trust property with his own if he is expressly permitted to do so by the terms of the trust instrument. The Langford instruments contain no express provisions of this kind.

2. On motion for rehearing, Judge Renfro elected to dissent and vote for affirmance of the trial court. 417 S.W.2d at 447. As previously indicated, the Supreme Court of Texas declined to review the case.

tees borrowed certain amounts of trust money, the amounts owed never exceeded their own cash balances. At any time, the accounts payable could have been paid in full. Since the trustees derived no personal benefit from the banking procedures they followed, counsel for appellee concludes that under Texas law there was no illegal self-dealing. His position is that in each Texas case where a court has found mishandling by a trustee, it has emphasized that the trustee knowingly used trust funds for his own benefit.[3]

This very persuasive advocacy poses the central question: In its opinion on motion for rehearing, did the court mean to say that there is no breach of trust if a trustee deposits trust funds in his personal account but never allows his cash balance to fall below the amount owing to the trust? Stated differently, did the court mean to imply that a trustee must commit some further defalcation to be guilty of illegal self-dealing? Considering the original opinion and the opinion on motion for rehearing together, we do not believe this is what the court meant. The beginning of the latter opinion demonstrates that the court did not intend to retreat from everything it said originally:

> We have carefully examined Appellee's persuasive Motion for Rehearing, but we have concluded that our original opinion is correct. We simply do not believe from the state of this record that the findings of the jury can be relied on because of the admission of certain inflammatory, highly prejudicial and inadmissible evidence concerning the appellant's personal habits. *We have attempted to furnish the trial court certain applicable legal principles which should govern him upon retrial of the cause.* (Emphasis added)

417 S.W.2d at 446. The implication of the last sentence is that the legal principles announced originally, e.g., section 10 of the Texas Trust Act and the section from Bogert concerning the deposit of trust funds in personal accounts, are to govern the case on retrial. Our conclusion that the court did not modify or withdraw its first statement of the applicable principles is reinforced by language near the end of the second opinion:

> What we have held is that the exculpatory language in the trust instrument here under consideration does not authorize self-dealing by a trustee. In view of the language of Section 10 of the Texas Trust Act, Article 7425b, we further express the opinion that the language of a trust instrument which specifically authorizes self-dealing by a trustee could present a serious question of public policy.

417 S.W.2d at 447.

To be sure, appellee can still argue with some force that the court must have meant something when it said it was not prepared to hold as a matter of law that the trustees borrowed large sums of trust money for their own benefit. In our judgment, however, the court was referring to another aspect of the case. Besides depositing large sums of trust money in personal bank accounts over a period of years, the trustees allegedly engaged in another kind of illegal borrowing, namely, withholding funds owing to the trusts in connection with lumber business carried on between the trustees and the trusts. We will come to this point in due course, but we say here that we are persuaded the court of civil appeals was expressing doubt about the lumber-business aspect of the case on motion for rehearing. We interpret the second opinion in this way and thus reject appellee's notion that the court had come

---

3. In this connection, appellee relies on Anderson v. Armstrong, 132 Tex. 122, 120 S.W.2d 444 (Tex.Comm'n App.1938, opinion adopted); Van Orden v. Pitts, 206 S.W. 830 (Tex.Comm'n App.1918, jdgmt adopted); Thomas v. Hawpe, 35 Tex. Civ.App. 311, 80 S.W. 129 (Tex.Civ.App. 1904, writ ref'd). In *Wichita Royalty Company*, supra, on which the court of civil appeals relies, it also appears that the trustee appropriated large sums of trust money for his own use.

to doubt whether the trustees actually benefited from the depositing of trust funds in their own accounts because it is self-evident that this practice is beneficial to a trustee. In other words, appellee's contention that the borrowing of trust funds does not constitute illegal self-dealing unless the trustee personally benefits is without substance because the trustee inevitably benefits, and, just as inevitably, the beneficiaries suffer.

In developing this idea, we will assume the cash balances in the trustees' accounts never fell below the amounts owing from their accounts to the trusts.[4] We note first that it is both a decided advantage and an unusual occurrence for a person to have large sums of money from outside sources in his bank account for a period of years on an interest-free basis. As part of the same picture, we observe that those from whom these funds are withheld are the losers because their money is earning no interest. Even though the borrower never spends the money but rather lets it stand idle so that he can always pay whatever he owes, certain benefits nevertheless accrue to him: With a larger account, he can borrow money from the bank at lower interest rates, reduce the service charges on his account, and perhaps even become a director of the bank. In short, the borrowed funds serve as a cushion for his account. While the borrower has this cushion, the one from whom the money is borrowed has no opportunity to let his money either appreciate by investment or earn interest in a savings account. With the advantages inherent on one side and disadvantages on the other, it would be unthinkable for courts to say that a trustee, on whom the highest duty of loyalty is imposed, can be the borrower and his trust the lender. Thus, the court of civil appeals said in both opinions that even the kind of exculpatory clause in the Langford instruments cannot authorize a violation of section 10 of the Texas Trust Act.[5] As a matter of law, the trustees' estates and Mrs. Shamburger's estate are liable for interest on the average amounts owing in each year (1945–1960) to appellants' trusts from Shamburger, Sr.'s bank accounts and the estate accounts. We leave exact accounting to the parties and the court below. The rate of interest will be discussed hereafter.

■■■■ B. We deal separately with trust funds allegedly deposited by Shamburger, Jr. in personal bank accounts because in this respect the record does not present such a clear picture of illegal self-

---

4. We assume there were always adequate cash balances to pay the trusts in full, but the record leaves us in doubt. At one point, Shamburger, Jr. gave the following testimony:

Q Can you give me an explanation as to why these particular accounts receivable were not paid to the children's trusts?
A Well, it hadn't been our policy and no one requested it.
Q Well, you were the trustee and you would have been the one to make the request, would you not?
A Well, I don't know. I think from the following events that they would have asked me if they had been unhappy about it. We had a lot of estate tax to pay, you know, at the time.
R., 626. On the other hand, when counsel for the grandchildren began to press about whether trust funds were used to pay in-

heritance taxes, thus reducing cash balances in the estate accounts below the amounts owing to the trusts, he seemed to change his testimony:
Q But you needed that money over there in the estate because the estate had all of these inheritance taxes to pay, didn't you?
A No, sir, I did not.
R., 635.

5. In his dissent on motion for rehearing, Judge Renfro said the court should invoke that provision of the Act, Tex.Rev. Civ.Stat.Ann. art. 7425b–24(E), which allows it to relieve a trustee, who has acted honestly and reasonably, from liability for violation of the specific provisions. While the majority did not speak to this point, it no doubt thought the depositing of large sums of trust money in personal accounts for a number of years was not reasonable.

dealing.[6] Appellee contends that the only evidence adduced by the grandchildren shows that in 1957 the trustee sold a large number of cattle, owned partly by himself and partly by the four trusts, and deposited the total receipts from the sale in a special bank account styled the "Texline Ranch Bank Account" in the First Wichita National Bank of Wichita Falls, Texas. He says these funds were held in the special account pending determination of the expenses of sale and the proper charges and credits as between the owners of the cattle. We agree that under these circumstances it would be inequitable to hold a trustee liable for interest. On the other hand, if Shamburger, Jr. left funds in this special account after expenses, charges, and credits were finally determined and after a reasonable time for distribution had elapsed, his estate would be liable for interest from the time the funds should have been distributed to the time they were actually distributed to the respective trusts. We leave ultimate resolution of this problem to the district court on remand.

Exhibits presented by plaintiffs-appellants indicate that Shamburger, Jr. owed money to their trusts in 1954, 1959, and 1960.[7] If this be true and if there be no sound business reason for the debts incurred in these years, as there apparently is for amounts owed in 1957, then his estate must pay interest on the average amounts owing to the respective trusts during these years.

██ C. Appellants demanded that interest on sums of trust money deposited in the trustees' own accounts be computed at ten per cent, the highest legal rate. As an original proposition, we might be inclined to limit the interest figure in this kind of case to the legal rate, six per cent, but we are not writing on a clean slate. In Texas cases, the

trustee who has used trust funds for his own benefit is uniformly charged with the highest legal rate. Ward v. Maryland Casualty Company, 166 S.W.2d 117 (Tex.Comm'n App.1942, opinion adopted); Anderson v. Armstrong, 132 Tex. 122, 120 S.W.2d 444 (1938, opinion adopted); Van Orden v. Pitts, 206 S.W. 830 (Tex.Comm'n App.1918, jdgmt adopted); United Hay Company v. Ford, 81 S.W.2d 776 (Tex.Civ.App.—Galveston 1935, writ ref'd); Thomas v. Hawpe, 35 Tex.Civ.App. 311, 80 S.W. 129 (1904, writ ref'd).[8] None of these cases suggest that under certain circumstances a lower interest rate would be appropriate, nor do they suggest that the highest legal rate should be imposed only in cases of serious defalcation. Moreover, in Anderson v. Armstrong, the court was faced with the specific question of whether the highest legal rate or the legal rate should be used to compute interest:

> The usual basis for allowing the highest legal rate of interest is to prevent the trustee (administrator in this instance) from making a profit upon the funds of the estate, and when it is uncertain as to profits which he may have made, the highest legal rate will be charged against him.

120 S.W.2d at 450. Since we know the trustees in the instant case benefited by keeping trust funds in their own bank accounts but are uncertain as to how much this was worth to them or how much it cost the trusts, we feel somewhat justified in requiring them to pay the highest legal rate. In any event, Texas law on the subject is unequivocal.

II. Other self-dealing—the lumber business.

A. Plaintiffs-appellants contend that they are entitled to interest on certain end-of-the-month balances owing from the C. D. Shamburger Lumber Company to the Shamburger-Langford Lumber

---

6. The state court's reluctance to hold that as a matter of law the trustees borrowed trust funds for their own benefit might have been caused by this aspect of the case as well as the lumber-business aspect.

7. Exhibit *C*, R. 302 and 304.

8. Ward v. Maryland Casualty Company, Anderson v. Armstrong, and United Hay Company v. Ford have the force of Texas Supreme Court decisions.

Company, a trust property. They have computed these balances to average $21,443.19 per month from August, 1952 to September, 1963. If these end-of-the-month balances simply reflected another method by which the trustees borrowed trust funds, we would lump them in the same category as other trust funds kept in personal bank accounts and estate accounts; but we must give separate attention to this aspect of the case because of countervailing factors.

C. D., Sr. was president and general manager of the C. D. Shamburger Lumber Company during his lifetime, and after his death his offices were assumed by C. D., Jr. Through use of this company's credit and without the investment of any trust funds, a trust lumber yard (Shamburger-Langford Lumber Company) was opened in Walters, Oklahoma in 1949. Thereafter, all necessary materials were supplied to the trust lumber yard on credit. From 1949 to 1952, it was continuously in debt to the parent corporation for advances of materials and credit. As it began to turn a profit, these debts were reduced and finally discharged. From 1949 to the time of suit, the parent corporation sold materials to the trust lumber yard at cost. From 1952 to the time of suit, there were fluctuating accounts receivable and accounts payable as between the parent and the trust lumber yard. These end-of-the-month reciprocal balances ran mostly in favor of the Shamburger-Langford Lumber Company, the trust property, though in 1955 and 1957 the balances ran mostly in favor of the parent.

■ Appellants would have us hold the trustees and C. D. Shamburger Lumber Company liable for ten per cent interest on each end-of-the-month balance that ran in favor of the trust lumber yard.[9] In other words, they ask us to divorce ourselves from the entire factual context and view each end-of-the-month balance that ran in favor of the trust property as an illegal, interest-free loan of trust funds by the trustees. As we see it, however, the job of a court of equity in a trust case is to balance all the relevant facts with an eye toward avoiding an unduly harsh result. In this regard, the words of Judge Learned Hand have continuing vitality:

■ The law ought not to make trusteeship so hazardous that responsible individuals and corporations will shy away from it.

Dabney v. Chase National Bank of City of New York, 2d Cir. 1952, 196 F.2d 668, 675. When we consider the facts that Shamburger, Sr. expended his own money to create the trust lumber yard, that the trust lumber yard was constantly in debt to the parent from 1949 to 1952, that many of the reciprocal balances after 1952 ran in the parent's favor, and that the trust lumber yard was at all times able to buy materials from the parent at cost, we are unable to say as a matter of law that the fluctuating accounts receivable and accounts payable resulted in an overall gain to the trustees and loss to the trust property. Excepting one transaction, the jury found that the trustees were not grossly negligent in their handling of the Shamburger-Langford Lumber Company.[10] We affirm this jury finding.

B. Appellants urge us to hold that Shamburger, Jr.'s estate must account for profits made by him through indirect dealings between the C. D. Shamburger, Jr. Supply Company and the Shamburger-Langford Lumber Company. Having affirmed the jury finding that the trustees were not grossly negligent in their

9. The district court dismissed the C. D. Shamburger Lumber Co. In view of the position we take on this point, it will be unnecessary to consider whether the dismissal was error.

10. The jury found that Shamburger, Jr. was grossly negligent in transferring to the Shamburger-Langford Lumber Co. a worthless account amounting to $8,594.83 for each trust. In exchange for this account, he took one-hundred cents on the dollar or $17,189.66. The jury awarded each trust $8,594.83, which amount was paid into the registry of the court by appellee.

handling of the trust lumber yard, we cannot so hold. We take the same view of these indirect dealings between C. D., Jr.'s supply company and the trust lumber yard as we did of the transactions between the trust lumber yard and C. D. Shamburger Lumber Company.

Shamburger, Sr. set up the supply company for his son in 1934. Since his lumber company could not buy certain materials directly from the manufacturer, he conceived the idea of establishing in his son's name a brokerage or jobbing business that could purchase the materials at a manufacturer's discount and resell to his lumber company at a slight profit. While the supply company did mark-up the price slightly on resale, there is undisputed testimony that the parent company got its materials from this source as cheaply or more cheaply than it could have got them from any other source. The parent in turn sold materials at cost to some twenty-seven branch lumber yards, including the trust lumber yard.

■ Appellants' theory is that it was illegal for Shamburger, Jr. to profit on materials sold first to the parent corporation and then at cost to the trust lumber yard.[11] In the light of undisputed testimony that the parent and in turn the trust lumber yard purchased materials at a price as low or lower than could have been obtained from any other source, it would be inequitable for this Court to hold that as a matter of law the trusts are entitled to an accounting for profits. Though the lumber business done between the trustees and the trusts was hazardous in the sense that any self-dealing is hazardous, we repeat that we leave the jury finding intact.

III. Failure of trustees to put trust funds out at interest.

■ After the trusts went out of the cattle business in 1957, a large amount of cash—apparently more than $100,000—was deposited in a trust checking account and left idle for seven years. The jury found that Shamburger, Jr.'s failure to put this trust money in a savings account did not constitute gross negligence. Faced with a similar jury finding, the court of civil appeals said in its first opinion:

It is also incumbent upon the trustee to put trust funds to productive use and the failure to do so within a reasonable period of time can render the trustee personally chargeable with interest.

417 S.W.2d at 444–445. We find nothing in the second opinion that modifies or retracts this statement. We cannot help but infer that the court was asserting a legal principle which would be applicable to Shamburger, Jr. in spite of the exculpatory clause in the Langford instruments. This is sound law, and we follow it willingly.[12] The trustee's failure to re-

11. Since there is no direct evidence of the profit made by the supply company through indirect sales to the Shamburger-Langford Lumber Co., appellants propose that an accounting be made by a mathematical division based on the supply company's total profits between 1950 and 1963, to wit $227,729.73. Since materials sold by the supply company ultimately went to twenty-seven branch lumber yards, they assume that C. D., Jr. made 1/27 of his profits off indirect sales to the trust lumber yard. Since appellants' trusts own 2/3 of the lumber yard, they ask for 2/3 of 1/27 of the supply company's profits or $5,622.96.

12. Restatement (Second) of Trusts (1957), § 180, Comment *d* is directly in point:

Although a trustee can properly deposit trust funds in a bank for the purpose of making the funds available from time to time for the payment of expenses or pending investment or distribution, he may incur a liability where he leaves an excessive amount of money on deposit for an unreasonably long time, instead of withdrawing and investing it. In such a case, if the deposit is not at interest and justifiable as an investment, the trustee is liable for interest lost by the failure to invest.

Also § 222(2):

A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith *or intentionally or with reckless indifference to the interest of the beneficiary,* * * *

move $100,000 from a checking account to a savings account is in the nature of an intentional omission which cannot be excused by a clause limiting his liability to matters of gross negligence. Accordingly, we hold that as a matter of law the trustee's estate is chargeable with interest computed at three per cent on trust funds left in a checking account for seven years unless it be determined on remand that the beneficiaries acquiesced.[13] The question of their acquiescence will be discussed hereafter.

IV. Conclusion.

We have what the Chief Judge of this Court has called "tag ends." If a jury should be empaneled on remand to determine remaining fact issues, we hold, as did the court of civil appeals, that evidence admitted at the first trial of Shamburger, Sr.'s kindness and of his numerous gifts to children and grandchildren was inadmissible.[14] With respect to this evidence, the court said:

> The motion in limine to exclude evidence concerning such extraneous matters should have been sustained. Such evidence and the arguments based thereon had no bearing upon the merits of the case or the ultimate fact issues which the jury had to determine and objections thereto should have been sustained.

417 S.W.2d at 441.

The question of acquiescence arose in this way: Both the state and federal district courts submitted issues that asked, in effect, whether the four-year statute of limitations had run on the beneficiaries' claims, and both juries answered affirmatively. In its first opinion, the court of civil appeals stated emphatically that the four-year statute was inapplicable to an express trust that had never been repudiated. On motion for rehearing, however, the court modified its position:

> For the reasons stated in our opinion, we do not believe the statutes of limitation can, under the circumstances in this case, bar recovery by appellant. But if the appellant were fully and fairly informed of the trustee's stewardship and appellant failed to make any protest, then a fact question may be presented as to whether appellant acquiesced to the actions of the trustee. If, however, the trustee actually benefited by reason of the confidential relationship, we do not believe that appellant would be estopped even though he acquiesced in the actions of the trustee unless such trustee had affirmatively made a full and complete disclosure.

417 S.W.2d at 446–447. The last sentence says that where a trustee has actually benefited by his actions, there is no question of acquiescence unless he made a full and complete disclosure. With respect to the depositing of trust funds in the trustees' personal bank accounts and in estate accounts, there is no issue of acquiescence to be presented to the trial court or jury because there was actual benefit to the trustees and no complete disclosure. On the other hand, a fact question is presented as to whether the beneficiaries acquiesced in Shamburger, Jr.'s failure to put large sums of trust money out at interest. The question as framed by the court of civil appeals is whether Stan and Dorothy Sue Langford were fully and fairly informed of this omission and yet made no protest.

The judgment of the court below is reversed and the case remanded for proceedings not inconsistent with this

---

13. Three per cent is the rate of interest requested by appellants. We accept this figure since it is less than what could have been earned in a savings account.

14. The court of civil appeals held that none of the jury findings could be relied on because of the admission of certain prejudicial evidence; however, the court was primarily disturbed about the admission of evidence that P. P. Langford, III was a ne'er-do-well. We have no such evidence in our case, and we would not reverse the judgment of the district court solely on the ground that evidence of Shamburger, Sr.'s kindness was introduced. We do hold that this evidence will be inadmissible on retrial.

opinion. As we have authority under 28 U.S.C. § 2106 to direct the entry of whatever order "may be just under the circumstances," we direct the district court to enter an order postponing further proceedings until such time as the state-court proceedings are finally terminated so that the court may have the benefit of any additional light cast on the substantive issues.