Marshall T. STEVES, Appellant,

v.

UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellee.

No. 7161.

Court of Civil Appeals of Texas, Beaumont.

Oct. 22, 1970.

Second Rehearing Denied Nov. 25, 1970.

Beckmann, Stanard, Wood & Keene, San Antonio, for appellant.

Matthews, Nowlin, Macfarlane & Barrett, San Antonio, for appellee.

KEITH, Justice.

Appellant's able counsel, true to the traditions of effective advocacy, takes us to task in his motion for rehearing for some of the language we used in describing the legal effect of the conduct of appellant in this case. The criticism is, perhaps to some extent, justified; and, to the end that the opinion may be as fair alike to all parties as is possible under our record, we withdraw the prior opinion of September 17, 1970 and substitute this in lieu thereof.

Steves, plaintiff below, appeals from a summary judgment entered in his suit for specific performance against the defendant, United Services Automobile Association (hereinafter called "USAA").

*Statement of Case*

Steves is president and principal stockholder of a private corporation known as Steves Sash & Door Company, Inc. Some years prior to our series of events, this corporation had established a profit-sharing trust known in our record as "Steves Sash & Door Company, Inc. Profit Sharing Trust" (hereinafter designated simply as "Trust"), of which Steves, the company attorney, and the company comptroller were the three trustees. In 1964, Trust acquired 212.354 acres of land northwest of San Antonio, for approximately $800.00 per acre or for a recited consideration of approximately $169,000.00, payable over a term of years. Thereafter, for reasons undisclosed in our record, the income of Trust declined appreciably and in February 1968, its auditor commented that the Trust was probably insolvent.

The auditor noted that with the installment of principal and interest due upon the note given for the purchase of the land, the Trust would be unable to meet its obligations during the coming year. He suggested that the Trust dispose of the non-revenue producing land. Steves, the leading actor in both the corporation and the Trust, procured an appraisal of the land, dated April 25, 1968, showing it to have a market value of "from $1,000.00 to $1,100.00 per acre."

About November 8 or 9, 1968, an architect approached Steves concerning the purchase by a then undisclosed principal of the tract of land mentioned earlier. Steves and the architect orally agreed upon a price of $500,000.00 cash for the tract. A written earnest money contract was entered into between Steves and USAA dated November 19, 1968, for the sale of the land. In the intervening period (between November 9 and November 19), Steves procured the delivery of a deed from the Trust to himself, the deed bearing a date of April 30, 1968, but it was not acknowledged by the grantors until November 13, 1968. This deed was filed for record on November 15, 1968. The three trustees, including Steves,

joined in the execution of the deed for a total consideration of $212,354.00. No cash changed hands, but Steves obligated himself to pay to the holders of the vendor's liens the balance due on the purchase by Trust; and the remainder due the Trust was represented by a personal promissory note given by Steves to the Trust, bearing interest at the rate of 5½ per cent and unsecured except for the lien retained in the deed, at best, a second lien on the property.

Six days later, the formal contract between Steves and USAA was entered into wherein Steves agreed to sell the land to USAA for the gross consideration of $500,000.00 in cash. We pause to note that at the time of the execution of the earnest money contract, USAA was ready to pay the consideration immediately upon tender of the deed and compliance by Steves with the remaining conditions in the agreement. Instead of taking cash immediately, Steves sought and procured the agreement of USAA to defer closing of the deal until June 1, 1969, in order that he might attempt to qualify the transaction for consideration as a long-term capital gain under the Federal Income Tax regulations then in effect.

At the time of the making of the contract between the parties, there were forty-nine active employees of Steves Sash & Door Company, Inc., who were participating members in and beneficial owners of the property of the Trust; and, an examination of the auditor's report mentioned previously discloses that the tract of land involved herein accounted for the bulk of the assets of the Trust. We remark, in passing, that the next annual installment upon the note owed by Trust to its grantors was not due until December, 1968, after the date of the contract between Steves and USAA.

Early in the spring of 1969, apparently as the result of publicity generated by the transaction, notice came to USAA that the Soil Conservation Service, an agency of the government of the United States, and San Antonio River Authority, a political subdivision vested with the power of eminent domain, had determined to take about 64 acres out of the tract for the purpose of constructing a dam and making other public improvements in the area. Steves denies any knowledge of any such plans of San Antonio River Authority, and makes no contention that USAA had any such knowledge of the subject before entering into the contract. Because of our disposition of the cause on other grounds, we do not give further consideration to this facet of the case, although both parties devote a large part of their respective briefs to a discussion of the matter.

Before June 1, 1969, Steves tendered to USAA a deed executed by him as grantor and was joined therein by his wife and the three trustees of Trust. He also tendered a title policy *binder* in compliance with his obligation to furnish a title *policy*. USAA refused to accept the deed or to pay the consideration, whereupon Steves sued to compel specific performance of the contract. In so doing, Steves specially disavowed his alternate right to accept the $25,000.00 earnest money deposit in lieu of compelling specific performance.

Both parties filed motions for summary judgment supported by affidavits, documents, admissions, depositions, etc., and that of USAA was granted while that of Steves was denied. It is from this judgment that Steves brings this appeal.

*Opinion*

■ The remedy of specific performance is strictly equitable in nature and is governed by the maxims and principles of equity. Bergstedt v. Bender, 222 S.W. 547, 549 (Tex.Com.App., 1920); Campbell v. McFadden, 9 Tex.Civ.App. 379, 31 S.W. 436, 442 (1895, error ref.); Nash v. Conatser, 410 S.W.2d 512, 519 (Tex.Civ.App.—Dallas, 1966, no writ); Ferguson v. von Seggern, 434 S.W.2d 380, 385 (Tex.Civ. App.—Dallas, 1968, error ref., n. r. e.); 81 C.J.S. Specific Performance § 1, p. 408; 49 Am.Jur., Specific Performance, § 2, p. 6;

52 Tex.Jur.2d, Specific Performance, § 2, pp. 522–523.

One of the more important maxims governing the remedy is that: "He who seeks equity must do equity"; or, as sometimes expressed: "He who comes into equity must come with clean hands." Riggins v. Trickey, 46 Tex.Civ.App. 569, 102 S.W. 918, 921 (1907, error ref.); 2 Pomeroy, Equity Jurisprudence (5th Ed., 1941) § 385, p. 51; 4 A.L.R. 44; 81 C.J.S. Specific Performance § 89, p. 606; 52 Tex.Jur.2d, Specific Performance, § 18, p. 536. The rule was stated by this court in Inman v. Parr, 311 S.W.2d 658, 709 (Tex.Civ.App. —Beaumont, 1958, error ref., n. r. e.), in this language:

"In order to be entitled to specific performance one seeking such remedy must come into court with clean hands and the contract must be equitable, perfectly fair in all its terms and free from any misrepresentations, fraud, mistake or misapprehension."

USAA contends that at the time Steves accepted the deed from Trust to the land involved in this suit, he breached his duty as a trustee; and, so it is argued, he comes into court with unclean hands. We agree. At a time when the Trust was not in default on its obligations to its grantor, Steves entered into a contract with USAA to sell the land for a sum which would bring him a personal profit of approximately $288,-000.00. In so doing, he violated the most elementary rules governing the conduct of a trustee.

The rule of law prohibiting a trustee from profiting from his own self-dealing with the corpus of the trust estate is set out in the case of Merriman v. Russell, 39 Tex. 278, 285 (1873),[1] from which we quote:

"The rule that a trustee shall not deal with the subject of-the trust for his own

benefit, is said to be absolute and universal. It is subject to no qualifications and to no exceptions.

"An abuse of a trust can confer no rights on the party abusing it, or those who claim in privity with him. It is a principle recognized at law in all cases, susceptible of being brought out as a ground of action or of defense in a suit at law, while its application in courts of equity is universally adopted * * *"

The broad language used in *Merriman,* supra, has not been diluted during the many years following its utterance. For instance, Justice Smedley in Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 387 (1945), says that the rule "is general in its use and is fundamental." And, on page 388 he continues:

" 'It is a well-settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity.' Magruder v. Drury, 235 U.S. 106, 35 S. Ct. 77, 82, 59 L.Ed. 151, 156."

The long list of authorities considered by the court in *Slay* needs little supplementation. We do, however, call attention to the fact that in the adoption of The Texas Trust Act, the Legislature incorporated this rule of law into the statute. Article 7425b–12, V.A.C.S., as amended, now provides in part:

"A trustee shall not buy or sell, either directly or indirectly, any property owned by or belonging to the trust estate, from or to itself or an affiliate; * * * or

---

1. The fact that this opinion was by the "Semicolon Court" does not, ipso facto, deprive it of precedential value. See Norvell, "Oran M. Roberts and the Semicolon Court", 37 Tex.Law Rev. 279, 292 (1959). See also, Greenhill, "Uniform Citations in Briefs", Appellate Procedure in Texas, Appendix, § A.1 [3–4].

from or to himself, a relative, employer, partner or other business associates; * * *"

This statutory prohibition echoes the provisions of the Restatement of the Law of Trusts (2d Ed.) § 170, p. 364, Comment b, reading:

"A trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a profit thereby. It is immaterial that the trustee acts in good faith in purchasing trust property for himself, and that he pays a fair consideration."

The universal applicability of the rule may be noted from this brief listing of a few of the texts upon the subject, each standing for the basic proposition noted in *Slay*. See: Bogert, Trusts and Trustees (2d Ed. 1960), § 543(A), p. 482; 90 C.J.S. Trusts § 303, p. 471 et seq.; 54 Am.Jur., Trusts, § 452, p. 359; 57 Tex.Jur.2d, Trusts, § 162, p. 543; Malinak, "Self Dealing by Fiduciaries—A Texas Survey," 39 Tex.Law Rev. 330 (1961).

One of America's most illustrious judges, Justice Cardozo while upon the New York Court of Appeals, in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546–547, 62 A.L.R. 1, 5 (1928), expressed the concept in these apt words:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate.

Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct of fiduciaries been kept at a level higher than that trodden by the crowd." [2]

■ Steves, having violated his fiduciary relationship with Trust, now invokes the aid of the chancellor to collect his profit. The fact that such may appear inordinately large does not alter the fact that he now comes into court with unclean hands. We do not, however, turn the case upon this point alone, although such would be warranted.

The Contract of Sale upon which the action is based required Steves to furnish to USAA an owner's policy of title insurance, a general warranty deed "conveying good and marketable title" to the property. The title insurance binder which Steves tendered contained this language:

"This Binder is delivered and accepted upon the understanding that you [US AA] have no personal knowledge or intimation of any defect, objection, lien, or encumbrance affecting said premises other than those shown under Schedule B hereof, and your failure to disclose any such personal information shall render this Binder and any policy issued based thereon, null and void as to such defect, objection, lien, or encumbrance."

■ The deed from the Trust to Steves was a link in the chain of title which would have been acquired by USAA; and, being of record, charged USAA with notice thereof and "the legal effect thereof." Cherry v. Farmers Royalty Holding Co., 138 Tex. 576, 160 S.W.2d 908, 911 (1942). Thus, USAA was charged with notice that

---

2. *Meinhard* is cited by Chief Justice Hickman in Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 788, 120 A.L.R. 720 (1938). See also: Langford v. Shamburger, 417 S.W.2d 438, 444 (Tex.Civ.

App.—Fort Worth, 1967, error ref., n. r. e.), and the companion case reported as Langford v. Shamburger, 392 F.2d 939 (5th Cir., 1968), where Judge Thornberry reached a similar result.

Steves had dealt with the Trust in a disloyal manner; and, having such knowledge, was charged with the consequences of Steves' wrongdoing. The question is answered by the early case of DeEverett v. Henry, 67 Tex. 402, 3 S.W. 566, 567 (1887):

> "That a trustee, with power to sell, cannot sell to himself, so as to divest the title of the *cestui que trust,* is an acknowledged principle in equity, and need not be discussed. If he does purchase from himself, he becomes a constructive trustee, made such by his own fraud; and equity will treat him, and all purchasers from him with notice, as holding the property in trust for the original beneficiary. [Citing authorities.] If there are any circumstances connected with the sale which validate it, these are matters of proof on the part of the trustee or purchaser. If not proved, and nothing appears but the fact of sale to himself by the trustee, and of purchase by a third party from him with notice, the sale must be held void, and, if the purchaser asserts title against the *cestui que trust,* the latter may recover the property from him. * * * There is no allegation that Henry knew of the decree which created the trust, and appointed his co-defendants trustees for disposing of the trust property by sale, and that he knew that these trustees had sold the trust property to one of their number. But these facts were in the line of Henry's title, and he could not trace it back to its source without being directly informed of their existence. To allege the title under which Henry claimed was therefore to charge him with notice that he had bought from a trustee, with power to sell, who had purchased the trust property from himself. It was to charge him with knowledge of the fraud committed by Collins that rendered the latter a constructive trustee for the plaintiff, and to place Henry in the same position after his own purchase. The plaintiff had the right to have the property taken from the hands of this involuntary trustee, who was claiming it against the equitable owners." (Emphasis by the Court.)

The text writer in 90 C.J.S. Trusts § 303, p. 477, sets out the rule in this language: "A purchaser of property, with notice that his vendor wrongfully acquired it from himself as trustee, takes the property subject to the same equities as when in the trustee's hands." See also, Humble Oil & Refining Co. v. Campbell, 69 F.2d 667, 671 (5th Cir., 1934); Comment, 3 Southwestern Law Journal 209 et seq. (1949). Cf. Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, 500 (1943).

The deed from the trustees to Steves, being of record, was notice to USAA of a "defect" and "objection", as mentioned in the title insurance binder, in the title. Thus, the binder tendered excepted from its operation the very point under discussion here, the invalidity of Steves' title as a matter of law.

In the contract between the parties, Steves had obligated himself, individually, to deliver to USAA "a General Warranty Deed * * * conveying good and marketable title" to the land. The deed which he tendered and which he seeks to force upon USAA in this action was executed by these grantors: "Marshall T. Steves, Individually, and wife, Allierose Patricia Galt Steves, and Marshall T. Steves, Tracy F. Smith and Ike S. Kampmann, Jr., as Trustees of Steves Sash & Door Company, Inc., Profit Sharing Fund." This deed was dated May 19, 1969, some six months after Steves recorded the deed which he had procured from the trustees.[3]

3. Appellee's counsel points to the fact that the tendered deed was not from Steves alone but was from Steves and other grantors. Thus, he says the tender "is inadequate as a matter of law, according to Bourland v. Huffhines, 244 S.W. 847 (Tex.Civ.App.—Amarillo 1922, writ dism'd)." There is language to be found in the cited case (at pp. 854–855, syllabus 16) tending to support the contention so made. However, this particular holding does not appear to have received the ap-

No one disputes the fact that the three trustees, including Steves, could have entered into a binding contract with USAA to convey the land for the consideration set forth in the contract, just as Steves tried to do for his own benefit. A deed from the trustees to USAA, pursuant to such a contract, would have been entirely within the lawful power and authority of the trustees. But, that is not the posture of the case as it reaches us. Instead, we are presented the picture of Steves as an individual, negotiating a contract of sale of land belonging to the Trust, procuring a deed from the trustees to himself, and then attempting to enforce the contract for his own personal profit.

Our record does not reflect any unconditional recognition on the part of Steves of the rights of the beneficial owners of the Trust. We are not presented with a situation wherein Steves had reconveyed the land to the Trust and then sought—as a representative of the Trust and for its benefit—to enforce the contract by the delivery of the deed from the trustees. At best, the deed which he tendered in performance of *his* obligation to convey merchantable title, may be considered as an attempted ratification by the trustees of the prior deed, or a ratification by the trustees of Steves' attempted personal gain at the expense of the cestui que trust. But, the beneficiaries, the equitable owners of the land, did not join therein and we find Steves seeking a judgment requiring USAA to pay to him—and not to the Trust—a half million dollars.

It is undisputed that there were forty-nine beneficial owners of the corpus of the Trust, of which Steves was one. By the same token, there were forty-eight beneficial owners of the corpus who had not in any manner been called upon to ratify or disavow the acts of the trustees in conveying the land to Steves; and, more importantly there was no showing that Steves

recognized the right of these beneficiaries to the profits he would realize from his dealing with USAA. Indeed, in his affidavit filed in the trial court in support of his motion for summary judgment (considered by the trial court as a response to the USAA motion for summary judgment), Steves says this:

"Prior to the closing date as set in the contract on June 1, 1969, a meeting was held between myself and the Trustees of the Steves Sash & Door Company, Inc. Profit Sharing Fund wherein it was agreed between the Trustees of the Profit Sharing Fund that they would join in as Grantors in the Deed with me individually to convey this tract of land to United Services Automobile Association and it was agreed that if necessary the proceeds of the sale of this property would be paid into the registry of the Court for a final determination as to whether or not I, individually, or the Profit Sharing Fund should receive the proceeds of the sale."

▮ The proposed interpleader action was not an unequivocal recognition by Steves that the beneficiaries were entitled to the profits from his bargain with USAA. It could in no manner bind the other forty-eight beneficiaries to the unauthorized transaction wherein Steves sought to pocket the profits unless prevented by a court in the interpleader action. We have mentioned earlier in this opinion the rule of universal application that the trustee's profit from dealing with the property of the Trust is the property of the beneficiaries, not the trustee. In proposing an interpleader action, Steves sought to make a unilateral determination that the beneficiaries would affirm the sale and accept the profits. But, he had no right to make *any* binding determination upon the members of the profit sharing plan—it was for the beneficiaries to make that decision, not

proval of any court writing upon the subject and the authorities cited in support of the statements there made do not add

weight to the holding. *Bourland* is, perhaps, overly broad in scope and we do not base our decision entirely thereon.

Steves. As the text writer in 90 C.J.S. Trusts, § 439 p. 848 says:

"As a general rule, where trust property has been diverted, and may still be traced, the cestui que trust has an election to either follow the res or to hold the trustee personally liable for the breach of trust, and *the trustee is without power to deprive the cestui que trust of such option*." (Emphasis supplied.)

These beneficiaries might very well have repudiated this transaction, although an unlikely event, and determine to pursue the purchaser (USAA) with knowledge of their rights to recover the land itself. See: *DeEverett,* supra, and the comment from Southwestern Law Journal noted earlier. They may have learned, before bringing action, what Steves learned before he began preparing for this suit: that USAA intended to use the land for its home office building. The improvements contemplated by USAA would have cost far more than the land; and, obviously, if the beneficiaries declined to accept the profit accruing to Steves from his self-serving dealings, USAA would either be delayed in the utilization of the land pending decision of the proposed interpleader suit, or be subject to direct action brought by the beneficiaries. No such consequence should be visited on a purchaser when Steves invokes the equitable remedy of specific performance.

■ A plaintiff suing for specific performance of a contract is not entitled to the relief as a matter of right. The granting or the withholding of the relief rests in the sound discretion of the court. The rule is stated concisely in the second appeal in Bourland v. Huffhines, 269 S.W. 184, 186 (Tex.Civ.App.—Amarillo, 1924), affirmed, 280 S.W. 561 (Tex.Com.App., 1926) where the court said:

"The remedy cannot be claimed as a matter of absolute right, and will always be denied whenever the circumstances are such as to make it inequitable for a court

of chancery to grant the relief. The matter of granting a decree for the specific performance of a contract rests in the sound discretion of the court. This discretion is judicial and must be controlled by established doctrines and settled principles of equity. Such relief will be granted, or withheld, upon a consideration of all the circumstances of the particular case."

Supporting the rule enunciated above see: Annotation, 65 A.L.R. 7; 52 Tex.Jur.2d, Specific Performance, § 21, p. 541; 49 Am. Jur., Specific Performance, § 8, p. 13; 81 C.J.S. Specific Performance § 9, pp. 417–418; Fisher v. Wilson, 185 S.W.2d 186, 190 (Tex.Civ.App.—Dallas, 1944), affirmed, 144 Tex. 53, 188 S.W.2d 150 (1945).

In our consideration of this cause, arising as it does from a summary judgment, we have been guided by the precepts laid down by Justice Greenhill in Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., 391 S.W.2d 41, 46–47 (Tex.Sup., 1965). Fortunately, in this instance, there is no dispute in the record as to the material facts. The keystone of Steves' case is his individually claimed right to a decree of specific performance; and, it is crystal clear that he is not entitled to the relief which he seeks. t?,sneHr-,h3  6s(-eme

Steves declared upon the contract which he, individually, had negotiated with US AA, and sought the aid of the court to compel USAA to pay to him, individually, one-half million dollars and to accept a deed showing him as one of the grantors, even to the extent of being joined therein by his wife. Steves, having declared upon this contract, has made a judicial admission and is now precluded from attacking its recitals. For, as Justice Walker had occasion to observe recently in Gevinson v. Manhattan Construction Co. of Oklahoma, 449 S.W.2d 458, 466 (Tex.Sup., 1969):

"A true judicial admission is a formal waiver of proof and is usually found in the pleadings or in a stipulation of the parties. See McCormick and Ray, Texas

Law of Evidence, 2nd ed. 1956, § 1127; Wigmore on Evidence, 3rd ed. 1940, § 2588 et seq. The vital feature of a judicial admission is its conclusiveness on the party making it. It not only relieves his adversary from making proof of the fact admitted but also bars the party himself from disputing it."

Steves' pleadings, and the contract which he sought to enforce for his own profit, constituted judicial admissions which "bars the party [Steves] from disputing" the invalidity of the very contract upon which he sued and the deed which he tendered.

Counsel for USAA, replying to Steves' motion for rehearing, aptly takes issue with our dissenting brother on the question of equities, if any, which may exist between Steves, his co-trustees, or the beneficiaries. We paraphrase and adopt such comment. The balancing of equities theory does not touch, even tangentially, the issues involved in this case. The case presented to us is one in which Steves sought specific performance of a contract. Whatever equities exist between Steves and other parties, either his co-trustees or the beneficiaries of the profit sharing trust, are not matters involved in this case. None are parties to this suit and we have no authority or jurisdiction to make a determination thereof. The adjustment of any such equities must await a determination by a court having before it the necessary parties to any such adjustment. Thus, the dissenting opinion does not point out what fact issue, relating to specific performance of Steves' contract with USAA, could be presented or would be presented for determination by the trial court.

Suffice it to say here, the uncontroverted record shows that Steves was not and is not entitled to the relief which he sought. So holding, the other points brought forward lose their effect. Even so, after an examination of such other points, we remain convinced that Steves was not entitled to any relief below and that the trial court made a correct disposition of the cause.

We, therefore, pretermit further discussion. The judgment below is in all things affirmed.

Steves' motion for rehearing is overruled; further motions for rehearing will be entertained in compliance with the provisions of the second main paragraph of Rule 458. Honeycutt v. Doss, 410 S.W.2d 772, 773 (Tex.Sup., 1966).

STEPHENSON, Justice (dissenting).

I respectfully dissent. It must be remembered this was not a trial on the merits before the court, but a summary judgment case. Both the trial court and this court are obligated to follow the rules, many of which are restated by Justice Joe Greenhill in Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., 391 S.W.2d 41, 47 (Tex.Sup., 1965). In that opinion reference is first made to Rule 166–A which provides that movant is entitled to judgment if it is shown that there is no genuine issue as to any material fact.

"The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. [citing cases] In other words, the evidence must be viewed in the light most favorable to the party opposing the motion. [citing cases] * * * All conflicts in the evidence are disregarded, and the evidence which tends to support the position of the party opposing the motion is accepted as true. [citing cases]"

In passing upon the motion for summary judgment filed by USAA, the trial court, as stated above, was obligated to accept as true the evidence contained in the affidavits filed by Steves in opposition to such motion for summary judgment. The affidavit of Tracy F. Smith stated in substance: That he is one of the trustees for the Trust and Comptroller of Steves Sash & Door Company, Inc., and in charge of the financial records. In 1966 and 1967, the Trust was unable to make the installment

payments due on the purchase price of the 212 acre tract of land in question. Steves Sash & Door Company, Inc. made advancements to the Trust so it could make such payments. Such advancements totaled $18,705.26 as of February 29, 1968. Additional payments were due within one year on such notes in the amount of $17,144.20, which the Trust was not financially able to make. Miller Montag, a CPA, wrote Smith a letter dated March 22, 1968, stating such real estate should be removed from the Trust. On that recommendation, the trustees conveyed the land to Steves, individually. The trustees had such land appraised by Roy Leslie, Jr., at $1,000.00 per acre and agreed to transfer the title to Steves for $212,367.00 on April 30, 1968. The deed was dated April 30, 1968, although it was not actually signed until later. Steves assumed the balance due on the land and executed a note for $126,988.77, which he paid January 30, 1969, plus $5,714.48 in interest. Steves told Smith and Ike Kampmann, Jr. (the other trustee) about the proposed sale to USAA and they urged him to proceed and Steves executed the contract of sale to USAA. Before June 1, 1969 (the closing date) the trustees had a meeting and agreed to join as grantors in a deed to USAA and that if necessary the proceeds from the sale of said property would be paid into the registry of the court for a final determination by the court as to the allocation of the proceeds between Steves, individually, and the Trust.

An affidavit of Miller Montag, indicated the following, in substance: That he is a CPA and has personal knowledge of the financial condition of the Trust. A balance sheet of the Trust as of February 29, 1968 showed current assets of $6,320.37 and current liabilities of $40,072.73. In his opinion, the Trust was insolvent in that it was unable to pay current bills as they came due. The 212 acres of land involved is shown on the balance sheet at a value of $169,939.50, against which there was a balance due of $95,812.60, of which $17,144.-

20 was due within one year. A statement of income for the period of March 1, 1967 to February 29, 1968 shows a net loss of $7,539.09. He advised the trustees to sell such land and invest in income producing assets. In his letter of March 22, 1968, he stated, "Some thought should be given to transferring the farm property owned by the Profit Sharing Trust out of the Profit Sharing Trust to either Marshall or the Steves Sash & Door Company, Inc."

The affidavit of Steves contained substantially the following: That he is President of Steves Sash & Door Company, Inc., and he, his wife, and children owned all of the stock. March 1, 1960, he executed the instrument creating the Trust. February 13, 1964, the Trust purchased the 212 acre tract for $169,885.60, paying $15,448.41 in cash, assuming a note upon which there was a balance of $43,340.70, and executed a new note in the amount of $110,950.00. The combined total due on both notes each year was $17,144.20. Steves personally guaranteed the new note executed. The Trust did not have sufficient funds to make the payments and as of February 29, 1968, Steves Sash & Door Company, Inc. had made advances to the Trust so the notes would not be foreclosed. About March 22, 1968, Miller Montag advised him the Trust should sell the 212 acres. Roy Leslie, Jr. appraised the land at $1,000.00 per acre by letter of April 25, 1968. "Shortly thereafter," the trustees decided to sell to Steves for $212,357.00, and their attorneys were requested to draw a deed and date it April 30, 1968. Steves had no plans or intentions to sell the land but intended to develop it himself. Some time after the close of the Hemisfair, but before the Olympics, Robert Ayers, a real estate agent, called and said he had someone interested in the land, but was told by Steves that it was not for sale. After Steves went to the Olympics in Mexico and returned home, Ayers called again and was told it could be bought for $2,500.00 per acre. Ayers and Steves drove over the property and Steves was told for the first time that USAA was Ayers' client. Shortly thereafter, Ayers

made an offer of $500,000.00, which Steves later accepted and the contract of sale was prepared and executed. Before the execution of such contract, Steves discussed the sale with the other two trustees, and they urged him to go ahead with the sale and the contract. Before June 1, 1969, the trustees had a meeting and it was agreed the trustees would join with Steves as grantors in a deed to USAA and if necessary the proceeds of the sale would be paid into the registry of the court for a final determination as to who would get the proceeds. After making this contract, Steves, personally, incurred an indebtedness and paid off his note to the Trust for this land.

The affidavit of John H. Wood, Jr. contained the following, in substance: That he is the attorney representing Steves. Prior to June 1, 1969, Steves and the other trustees in regular meeting agreed the purchase price in the contract with USAA was reasonable and fair, and that the trustees would join with Steves individually in executing a warranty deed to USAA. The trustees knew the escrow agent, Guaranty Abstract & Title Co., would pay the proceeds of the purchase price to them jointly and severally by check or draft, and that it would be necessary for the trustees and Steves to tender the proceeds of the sale into court to have adjudicated the respective rights of Steves and the Trust. The escrow agent had repeatedly advised Steves and the trustees that the proceeds would be paid to the trustees and that Steves could not get any part of the money without obtaining a court order.

December 5, 1969, the trial judge entered an order permitting Steves to file a supplemental petition in reply to defendant's answer and defendant's motion for summary judgment. This supplemental petition contained an affidavit signed by Steves in which he swore that he had personal knowledge of all the facts alleged and that the same were true and correct.

Among other allegations, Steves denied any breach of his fiduciary duty as a trus-

tee. He stated that positive and irretrievable commitments on the part of Guaranty Abstract & Title Co., the escrow agent, to pay the money into the registry of the court, for the court to determine what sums of money, if any, were to be paid to him and the Trust; that the arrangements had been made before June 1, 1969; and that Guaranty Abstract & Title Co. had been instructed to file such interpleader at Steves' expense. The trial court signed and entered an order granting defendant's motion for summary judgment December 10, 1969.

I agree with the majority opinion that a trustee cannot profit from self-dealing with his trust, and Steves must not be permitted to do so. However, there are many equities which must be adjusted between Steves and this Trust. First, as shown by the affidavits above, Steves personally guaranteed the note executed by the Trust in purchasing this land. Then the Steves Sash & Door Company, Inc. (wholly owned by Steves and his family) made advances to the Trust so the 1966 and 1967 installments on the notes could be paid. The Trust became insolvent and the trustees sold the land to Steves and a cash payment was made, the note assumed by the Trust, and the note executed by the Trust in purchasing the land, were each paid in full. At this point, Steves has some $212,000.00 invested in this land. Steves executed a contract of sale with USAA under the terms of which he obligated himself to furnish an Owners Policy of Title Insurance and a good and marketable title to the land in question. If Steves acquired any title under the deed from the Trust, such title would be conveyed by the deed executed by him individually and tendered to USAA. If the Trust still had any title to this land after the deed to Steves, such title would be conveyed by the deed executed by the trustees and tendered to USAA. The Trust Indenture provided that the title to all of the assets of the Trust would be vested in the trustees. Such Trust Indenture specifically gave the trustees all of the rights, powers and au-

thority under the provisions of Section 25, of Article 7425b, V.A.C.S., which include the right to sell and dispose of real estate. Paragraph H of such Trust Indenture reads as follows:

> "H. Persons dealing with the Trustees are not required to see the application made by the Trustees of the funds or other property received by Trustees from such persons."

In my opinion the deed from Steves individually and the trustees of the Trust, together with the Title Binder, complied with the terms of the contract. The pleadings and the affidavits show arrangements had been made to pay the purchase price into the registry of the court by the escrow agent, Guaranty Abstract & Title Co. Such court could adjust the equities between the parties and see to it that Steves did not profit from his self-dealing with his trust. I would reverse and remand this case for trial.