Daniel GEVINSON et al., Petitioners,

v.

MANHATTAN CONSTRUCTION COMPANY
OF OKLAHOMA et al., Respondents.

No. B–624.

Supreme Court of Texas.

Dec. 31, 1969.

Smith, Schulman, Rawitscher & Cordray, J. Edwin Smith, Houston, Gottlieb & Schiff, New York City, for petitioners.

Thornton, Stamper & Dalton, David M. Thornton and Andrew T. Dalton, Jr., Tulsa, Okl., Vinson, Elkins, Weems & Searls, Houston, for respondents.

WALKER, Justice.

The principal question to be decided in this case is whether the record shows as a matter of law that plaintiffs own the partnership interests in a limited partnership known as 21 Turtle Creek Square, Ltd., hereinafter referred to as 21 TCS, Ltd. They claim to have acquired the same by assignment from Kirkeby-Natus Corporation, which held a lien thereon.

They also claim, and the trial court held as a matter of law, that the principal defendant, Dr. Daniel Gevinson, had judicially admitted, and was estopped to deny, that Kirkeby-Natus had acquired title to the partnership interests by foreclosure of its lien prior to the assignment to plaintiffs.

21 Turtle Creek Square is a high rise apartment building in Dallas. It is owned by 21 TCS, Ltd. and was built by Manhattan-Dalmark as general contractor. Manhattan-Dalmark is a joint venture composed of Manhattan Construction Company of Oklahoma, Manhattan Construction Company of Texas and Dalmark Corporation.

This suit was brought by Manhattan of Oklahoma and Manhattan of Texas, hereinafter referred to jointly as Manhattan, for themselves and on behalf of Manhattan-Dalmark to: (1) establish that Manhattan is the owner of 21 TCS, Ltd.; and (2) recover on certain money claims and establish the same as liens against the apartment building. Dr. Daniel Gevinson, 21 TCS, Ltd., and 21 Properties, Inc. are defendants. Dalmark was also made a party because it is controlled by Gevinson and refused to join as a plaintiff. Defendants filed a cross-action against Manhattan, C. A. Bullen and David M. Thornton for recovery of title and possession of the apartment building and for damages for breach of contract. Bullen is President of Manhattan of Texas. Thornton is attorney for Manhattan and acted as trustee for them in the transaction through which they claim to have acquired 21 TCS, Ltd.

Gevinson has worn many hats. He organized and, at one time at least, owned all the stock of the following corporations: (1) 21 Properties, Inc.; (2) Dalmark Corporation; (3) Gevinson Associates Construction Company; (4) Mardal Corporation, and (5) a number of corporations that owned various other apartment buildings and a motel. His stock in the last mentioned group of corporations is referred to by the parties as the 608 shares. The

original ownership of 21 TCS, Ltd. was as follows: a ½% general partnership interest owned by 21 Properties, Inc., a ½% general partnership interest owned by Gevinson, and a 99% limited partnership interest owned by Gevinson. The trial court concluded as a matter of law that 21 TCS, Ltd., Mardal, and Gevinson Associates was each the alter ego of Gevinson, and this holding has not been attacked.

At the conclusion of a jury trial, judgment was rendered awarding Manhattan: (1) the interests formerly owned by Gevinson in 21 TCS, Ltd. and the entire 100 shares of stock of 21 Properties Inc., hereafter referred to as the partnership interests; (2) judgment against 21 TCS, Ltd. and 21 Properties, Inc. for $1,104,881.72, and against Gevinson for $230,863.00 of this amount; and (3) foreclosure of a lien for the $1,104,881.72 affixed on the real and personal property of 21 TCS, Ltd. The trial court held that Manhattan was entitled to the partnership interests as a matter of law, and the remainder of the judgment is based on the jury's verdict.

The Court of Civil Appeals modified the judgment of the trial court so as to award Manhattan, Thornton and Bullen title to the apartment building. It reversed the judgment of the district court in all other respects and remanded the cause for another trial. 420 S.W.2d 486. All parties filed applications for writs of error, and all applications were granted.

 The trial court's judgment has never been attacked on the ground that it should have awarded plaintiffs title to the partnership property rather than title to the partnership interests. Plaintiffs did not sue for the property, and there is no basis in the record for modifying the trial court's judgment to give them title thereto. The question to be decided is whether they have established as a matter of law their ownership of the partnership interests. This question must be considered against the background of the construction loans for building 21 Turtle Creek Square, the con-

struction contracts, and several other loans made to Gevinson and secured by pledges of various securities. Although plaintiffs argue to the contrary, an assignment in the motion for new trial is not a prerequisite to the right to complain on appeal of the action of the trial court in withdrawing the claim for the partnership interests from the jury and rendering judgment thereon for the plaintiffs. Rule 324, Texas Rules of Civil Procedure.

## Construction Loans

21 TCS, Ltd., as owner, obtained a commitment from the Federal Housing Administration for insurance of a mortgage in the amount of $9,997,100.00 for construction of the apartment building. Arrangements were made for the New York Teacher's Retirement System to become the permanent mortgagee, and for the National Commercial Bank and Trust Company of Albany to do the interim financing. 21 TCS, Ltd. executed a deed of trust on the real estate securing the payment of a note for $9,997,100.00 to the Albany Bank and also executed a regulatory loan agreement with FHA.

## Construction Contracts

Gevinson discussed construction of the apartment project with Bullen, President of Manhattan of Texas, and proposed that one of his companies, Dalmark, participate as a prime contractor and that two of his other companies, Gevinson Associates and Mardal, be awarded subcontracts. Bullen agreed to this proposal after making an investigation and learning that the plan was not objectionable to FHA.

21 TCS, Ltd. and Manhattan-Dalmark executed a contract for construction of the apartment project on June 6, 1962. Under its terms the general contractor was to be paid the actual cost of construction plus a fixed fee of $418,733.00, but with the proviso that the owner would not in any event be required to pay more than $8,841,705.00. It was provided that $172,096.00 of the

fixed fee would be paid in cash, and the remainder was evidenced by the note of 21 TCS, Ltd. for $246,037.00 due on or before June 1, 2003, with interest from maturity at the rate of 6 per cent per annum. The parties further agreed that any surplus cash from the permanent mortgage loan would be applied on the note.

Manhattan-Dalmark subcontracted certain portions of the work to Mardal for $1,204,000.00 and to Gevinson Associates for $3,220,000.00. By the terms of these contracts, the subcontractors were to be paid the stipulated amounts without regard to the cost of the labor and materials they furnished.

### Loans Secured by Pledges

To finance the purchase of the land and create the required owner's equity in the project, Gevinson consummated a number of other loans. In so far as material here, there were two principal lenders: Wallace Investments, Inc. and Kirkeby-Natus Corporation. On June 6, 1962, Gevinson executed to Wallace two notes, one for $1,650,000.00 due 18 months after date and the other for $300,000.00 payable in monthly installments of $50,000.00 each, beginning March 6, 1963. Both loans were secured by deeds of trust on approximately 13 acres of land adjoining the property on which the apartment building was to be erected, by a second-lien pledge of the 608 Shares, and by a first-lien pledge of the partnership interests.

This brings us to the pledges that are the basis of Manhattan's claim of title to the partnership interests. Gevinson arranged for Kirkeby-Natus Corporation to take up, renew and extend an indebtedness owing to Morton Wasserman. A note for $1,700,000.00 dated June 6, 1962, payable in monthly installments and with the entire balance due June 6, 1965, was executed to Kirkeby-Natus by Gevinson Associates and a number of other corporations controlled by Gevinson. The note was guaranteed by Gevinson personally and was secured by a first-lien pledge of the 608 Shares. It was further secured by a second-lien deed of trust on the 13 acres and a second-lien pledge of the partnership interests, subject to the first lien held by Wallace. On July 20, 1963, Kirkeby-Natus loaned another $200,000.00 to Gevinson Associates and others, and the partnership interests were pledged as part of the security for this loan. The stock certificate evidencing the 100 shares of 21 Properties, Inc. was held by Wallace in connection with its loan and was never in the possession of Kirkeby-Natus. On February 14, 1964, Kirkeby-Natus purchased the $1,650,000.00 note from Wallace. Wallace continued to hold the $300,000.00 note and the first lien securing same on the partnership interests, but Kirkeby-Natus was granted the right to acquire the pledged security by paying the balance due on the $300,000.00 note.

### The Controversy Develops

The Albany Bank made advances as the work on the apartment project progressed. By September, 1963, the building was practically complete, and it was formally opened for tenant occupancy the following February. In April, 1964, Kirkeby-Natus took over or was allowed to assume management of the apartment building, and on April 17, 1964, Gevinson executed and delivered to Kirkeby-Natus, upon its demand, the following documents: (a) a stock power for transfer of the 100 shares of 21 Properties, Inc. signed by Gevinson and dated April 17, 1964; (b) Gevinson's *undated* resignation as a general partner of 21 TCS, Ltd.; (c) an instrument dated April 17, 1964, assigning to Kirkeby-Natus all his right, title and interest as a limited partner of 21 TCS, Ltd.; (d) an amendment to the certificate of limited partnership executed by Gevinson and 21 Properties, Inc. as general partners and by Gevinson as a limited partner, under date of April 13, 1964, and stipulating that upon the retirement, death or disability of a general partner, all of his interest would belong to the remaining general partner; and (e) Gevin-

son's *undated* resignation as an officer and director of 21 Properties, Inc. On or about June 22, 1964, Kirkeby-Natus contracted to sell the assets of 21 TCS, Ltd. to one William A. Riesenfeld.

When the building was completed, it became necessary to replace the interim mortgage with the permanent mortgage loan. Before the permanent loan could be closed, the owner was required to furnish a final certification of costs to the interim lender, the permanent mortgage lender, and the FHA. The owner was expected to obtain his figures from a final cost certification furnished by the general contractor, and Manhattan employed Robert E. Groth, a Certified Public Accountant, to prepare the same. Because of the several roles played by Gevinson and his companies as owner, general contractor, and subcontractor, FHA had made an investigation and determined not to allow as certifiable costs $230,863.00 of the profits that would otherwise have been earned by Gevinson Associates and Mardal under their subcontracts. This meant a reduction in the permanent loan, but Manhattan-Dalmark had previously paid the two subcontractors in full. The cost certification prepared by Groth showed the reduction in the subcontractors' profits and also allocated to them certain overhead and other costs that Gevinson insisted should be borne by the general contractors. He refused to sign the owner's certification of costs.

By July, 1964, there was no money available to pay interest on the interim loan, and the Albany Bank was threatening to foreclose. Kirkeby-Natus was in possession of the apartment building and had collected some $55,000.00 in rent but refused to apply any of this money toward the payment of interest. In the latter part of July a meeting was held in the apartment building to discuss the possibility of closing the permanent loan. This meeting was attended by Groth, Gevinson and his attorney, D. M. Fortenberry, who is Treasurer of Manhattan of Oklahoma, and Sidney N. Weniger, who is a Vice-President of Kirkeby-Natus. No agreement could be reached for signing the cost certification and closing the permanent loan, and it was after this meeting that Gevinson wrote the two letters that plaintiffs say contain judicial admissions, and estop him to deny, that Kirkeby-Natus had become the owner of the partnership interests by foreclosure.

On August 10, 1964, counsel for the Albany Bank advised 21 TCS, Ltd. and Manhattan-Dalmark that he had received instructions to post the property for foreclosure. On August 27, 1964, Thornton and Fortenberry went to New York where they met with Mr. Altman, an attorney for Kirkeby-Natus. As a result of that meeting, Kirkeby-Natus executed and delivered a written instrument dated August 26, 1964, assigning to Thornton, as Trustee, all its right, title and interest in and to the partnership interests and delivering to the assignee the five documents Gevinson had delivered to it on April 17, 1964, and an instrument signed by Kirkeby-Natus and Riesenfeld cancelling and terminating their agreement of June 22, 1964, for the sale of the assets of 21 TCS, Ltd. The relevant portions of the assignment are quoted in the margin.[1] The consideration given for

---

1. Kirkeby-Natus Corporation, a Maryland corporation with an office at 40 Wall Street, New York City, in consideration of One Dollar ($1.00), receipt whereof is hereby acknowledged, hereby quitclaims and releases unto David M. Thornton, Esq., as Trustee, all its right, title and interest in and to or pertaining to:
 1. All the outstanding capital stock of 21 Properties, Inc., a Texas corporation.

 2. All the limited partnership interests in 21 Turtle Creek Square, Ltd., a Texas limited partnership.

 3. All other rights and interests which it may have pertaining to the aforesaid corporation, the aforesaid limited partnership and the apartment building and underlying land owned by said limited partnership.

To effectuate the foregoing quitclaim and release, there has been delivered to

the assignment appears to be somewhat illusory. About a year previously, Manhattan-Dalmark had advanced $50,000.00 to Gevinson Associates against the latter's profits on the subcontract, and Kirkeby-Natus had guaranteed repayment of this amount to Manhattan. The evidence will support the conclusion that the assignment was executed in consideration of Manhattan's agreement to release Kirkeby-Natus from this guaranty provided Manhattan received payment of the $50,000.00 out of the proceeds of the permanent mortgage loan.

Immediately after consummating the transaction with Kirkeby-Natus, Thornton and Fortenberry flew to Dallas and attempted to acquire the prior lien on the partnership interests held by Wallace. The balance unpaid on the Wallace $300,000.00 note was then about $37,000.00. Thornton and Fortenberry were unwilling to pay that much, and they did not acquire the note or the interest of Wallace in the pledged property. The $300,000.00 note and the original stock certificate for the 100 shares of 21 Properties, Inc. were eventually acquired from Wallace by J. Alex Blakeley, who was acting as attorney for Gevinson.

During the period from August 26 to the time the loan was closed on November 30, 1964, Thornton had numerous conferences with FHA "to see whether or not they would go ahead and close the loan and accept my signature as General Partner in * * * 21 Turtle Creek Square, Ltd.; and after a long number of meetings, they agreed to go ahead and accept our ownership of this project under these papers." To establish his right to close the loan, Thornton did the following: (1) he filled in the dates on Gevinson's undated resignations as an officer and director of 21 Properties, Inc. and as a general partner of 21 TCS. Ltd.; (2) he purchased a stock certificate book and filled out a new stock Certificate No. 1 for 100 shares of 21 Properties, Inc. in the name of David M. Thornton, Trustee; and (3) he conducted a meeting at which he, assuming to act as sole stockholder of 21 Properties, Inc., elected himself, Bullen and Fortenberry officers and directors of the corporation. The newly issued stock certificate was signed by Thornton as President and Fortenberry as Secretary-Treasurer.

The permanent mortgage loan in the amount of $9,910,900.00 was closed on November 30, 1964. The loan papers were executed by Thornton for 21 Properties, Inc. as general partner of 21 TCS, Ltd. Gevinson was present when the loan was closed but was not allowed to speak. After the closing of the permanent mortgage loan, Manhattan took over the management

---

David M. Thornton, Esq., as Trustee, the following:
 A. Executed Stock Power dated April 16, 1964, covering 100 shares of the capital stock of 21 Properties, Inc.
 B. Amendment of Certificate of Limited Partnership dated April 13, 1964, executed by Daniel Gevinson as General Partner, Daniel Gevinson as Limited Partner and 21 Properties, Inc. by Daniel Gevinson, President, as General Partner.
 C. Undated Resignation of Daniel Gevinson as General Partner of 21 Turtle Creek Square, Ltd.
 D. Assignment dated April 17, 1964, executed by Daniel Gevinson as Assignor and Kirkeby-Natus Corporation by Sidney N. Weniger as Assignee, relating to the limited partnership interests of 21 Turtle Creek Square, Ltd.
 E. Undated Resignation of Daniel Gevinson as officer and Director of 21 Properties, Inc.
 Nothing to the contrary stated in said documents shall be deemed to reflect any other type of transaction other than said documents were executed for the purpose of further securing Kirkeby-Natus Corporation as to the indebtedness owing to it by Gevinson Associates Construction Company, Inc.
 It is the intention of this document, however, that Kirkeby-Natus Corporation releases and quitclaims unto David M. Thornton, as Trustee, whatever rights it may have under the aforesaid documents.

and operation of the apartment building. They had previously instituted the present suit to establish and foreclose liens on the building. Some 15 months after the permanent loan was closed, their petition was amended to add a claim of title to the partnership interests.

## Law Questions

■ In addition to their contentions that Gevinson has judicially admitted, and is estopped to deny, that Kirkeby-Natus foreclosed on the partnership interests, plaintiffs say that in any event the assignment from Kirkeby-Natus to Thornton, Trustee, constituted a foreclosure by exercise of the power to sell either to itself or others, at public or private sale, as authorized by the collateral agreements securing its loans.[2] We do not agree. The purpose of a foreclosure is to subject property covered by a lien to payment of the indebtedness secured by the lien. The assignment in this case does not even purport to transfer the property or the interest of the pledgor therein but simply assigns all of the right, title and interest of Kirkeby-Natus. There was no fair and meaningful sale, moreover, because the transaction did not yield any consideration or thing of value that might benefit the pledgor by being applied on the indebtedness. We hold that an effective foreclosure is not conclusively established by the assignment from Kirkeby-Natus to Thornton, Trustee.

This brings us to the two crucial letters written by Gevinson. One consists of 16 typewritten pages addressed to Mr. Phillip Blumberg, President of Kirkeby-Natus, on July 24, 1964. The other consists of 77 typewritten pages addressed to Mr. Marsh Cunningham, National Director of Rental Housing of FHA on August 1, 1964, and sworn to by Gevinson before a notary public. The portions of these letters emphasized by plaintiffs and the trial court are quoted in the margin.[3] Gevinson introduced the Cunningham letter after Thornton, while on the witness stand, had read one sentence therefrom to the jury for the purpose of showing, according to the witness, that Gevinson had signed a sworn statement that Kirkeby-Natus had fore-

2. Defendants say that the case was briefed in the trial court on the theory that the law of New York controls the determination of this question. Our attention has not been directed to any pleading or proof concerning the law of that state or to a motion that the trial court take judicial notice thereof as provided in Rule 184a, T.R.C.P. For the purpose of this opinion, therefore, we presume that the law of New York is the same as that of Texas. See Milner v. Schaefer, Tex.Civ.App., 211 S.W.2d 600 (wr. ref.); 30 Tex.L.Rev. 253.

3. *Excerpt from letter to Philip Blumberg*:
"I assigned my assets as General Partner and Limited Partner in 21 Turtle Creek Square, Ltd. and executed resignations and transferred my stock ownership in 21 Properties, Inc. and resigned as Corporate and General Partner in 21 Properties, Inc. I turned over approximately $38,000 of rental income which rightfully was owed to me by 21 Turtle Creek Square, Ltd. * * *"
*Excerpts from letter to Marsh Cunningham*:
"As a result of the aforementioned investigation. K–N Corporation has taken over, as of March, 1964, as General and Limited Partner of 21 Turtle Creek Square, Ltd., and as officers and directors and owner, the stock of 21 Properties, Inc."
"It was illegally taken away from me by Kirkeby-Natus Corporation and has been out of my hands since the second month of tenant occupancy, March 1964."
"They removed me as General and Limited Partner of 21 Turtle Creek Square, Ltd. and from the operation and management of the apartment building in March of 1964, the second month of tenant occupancy."
"When Kirkeby-Natus Corporation took over my partnership interest under the terms of their loan agreement * * *."
"Almost immediately after taking over my assets, they entered into a contract for the sale of the assets of 21 Turtle Creek Square, Ltd. with a Mr. William Riesenfeld of New York City and advised me that I was no longer to operate or manage the project as Mr. Riesenfeld had taken over the operation immediately upon execution of the contract."

closed. Part of Gevinson's letter to Blumberg is quoted therein.

It has been said that one who introduces a document vouches for its accuracy and will not be allowed to impeach or contradict its recitals. This rule can avail plaintiffs nothing, because it has been largely engulfed by its own exceptions. In analogy to the rule that a party may prove the truth of particular facts in direct contradiction of the testimony of his witness, he may also disprove factual recitals in a document introduced by him. See Hillman v. Hillman, 138 Tex. 111, 157 S.W.2d 143; Masterson v. Bouldin, Tex.Civ.App., 151 S.W.2d 301 (wr. ref.); Ballard v. Aetna Cas. & Sur. Co., Tex.Civ.App., 391 S.W.2d 510 (wr. ref. n. r. e.); Brumit v. Cokins, Tex.Civ.App., 281 S.W.2d 154 (wr. ref. n. r. e.); 29 Am.Jur.2d Evidence § 840; 32A C.J.S. Evidence § 1040(4).

Plaintiffs further contend that since Gevinson introduced his letter to Cunningham, the statements therein constitute judicial admissions. A true judicial admission is a formal waiver of proof and is usually found in the pleadings or in a stipulation of the parties. See McCormick and Ray, Texas Law of Evidence, 2nd ed. 1956, § 1127; Wigmore on Evidence, 3rd ed. 1940, § 2588 et seq. The vital feature of a judicial admission is its conclusiveness on the party making it. It not only relieves his adversary from making proof of the fact admitted but also bars the party himself from disputing it.

The testimonial declarations of a party are occasionally held to be equally conclusive on the theory that it would be absurd and manifestly unjust to allow a party to recover after he has clearly and unequivocally sworn himself out of court. There may also be cases in which the extra-judicial verified statement of a party might, when introduced by him, be given the conclusive effect of a judicial admission. In either instance, whether the admission be made orally from the witness stand or in a written instrument introduced in evidence, it is essential, among other things, that the statement be clear and unequivocal. See Griffin v. Superior Ins. Co., 161 Tex. 195, 338 S.W.2d 415; United States Fidelity & Guaranty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224 (wr. ref.). Before treating declarations of a party as judicial admissions, moreover, it is important to consider whether the statement relates to facts peculiarly within the declarant's own knowledge or is simply his impression of a transaction or an event as a participant or an observer, and if the latter whether the statement is contradicted by other evidence. See Annotation, 80 A.LR. 624; Wigmore, *supra*, § 2594a.

Gevinson's letters do not state facts peculiarly within his own knowledge but describe transactions he observed or in which he participated or about which he had heard. His statements are not so clear and unequivocal, moreover, as to constitute conclusive judicial admissions. Although the letter to Blumberg states that he had assigned the partnership interests to Kirkeby-Natus and executed resignations, other portions of the letter make it clear that the assignment was executed as collateral security for the indebtedness owing to Kirkeby-Natus. Elsewhere in the letters he complains of the "unauthorized and questionable actions" of Kirkeby-Natus, and states that "this magnificent project will go into foreclosure because it was illegally taken away from me by Kirkeby-Natus." Neither of the letters constitutes a clear and unequivocal statement that Kirkeby-Natus had legally foreclosed its lien or acquired title to the partnership interests by any other means, and they cannot be treated as a judicial admission to that effect.

Before considering the estoppel question, it should be pointed out that Gevinson offered two letters addressed to Mr. E. J. Dee, Director of FHA at Dallas, early in August, 1964. One of these letters, written by Phillip Blumberg, President of Kirkeby-Natus, on August 4, 1964, states that Altman, counsel for Kirkeby-Natus, is writing at the request of Kirkeby-Natus to give full details concerning the Turtle Creek proj-

ect. The other letter, written by Altman on August 6, 1964, reads, in part, as follows:

> "There has been no change in the ownership of the project. The project is presently owned by the partnership, 21 Turtle Creek Square, Ltd. There has been no change in the partners. The general partners remain Daniel Gevinson and 21 Properties, Inc. The stock of 21 Properties, Inc. was and still is owned by Dr. Gevinson * * * The limited partner was and is, Dr. Gevinson. The aforesaid interests of Dr. Gevinson, however, have, as above set forth, been pledged as collateral."

 These letters tend to establish that, contrary to the plaintiffs' contentions, Kirkeby-Natus did not ever become owner of the partnership interests. There is a dispute between the parties as to whether they were admitted into evidence or excluded by the trial court.[4] We do not attempt to resolve this question but simply observe that, on the present record, the letters should have been admitted. They constitute admissions by one under whom plaintiffs claim and were probably written at a time when Kirkeby-Natus held whatever title was transferred to Thornton, Trustee. McCormick and Ray, *supra,* § 1172 et seq.; Wigmore, *supra,* § 1080 et seq. The witness Blakeley should also have been allowed to testify what Weniger, Vice-President of Kireby-Natus, said about ownership of the partnership interests at the meeting attended by Fortenberry in July, 1964. Evidence of this nature apparently was excluded on the basis of the trial court's conclusion that Gevinson had judicially admitted a foreclosure by Kirkeby-Natus.

 Turning now to the estoppel question, evidence of reliance must be found in the circumstances plus the testimony of Thornton and Fortenberry, both of whom are interested witnesses. The general rule is that evidence given by an interested witness, even though uncontradicted, presents an issue to be determined by the trier of fact. This rule is not without exception, however, and conclusive effect may be given to the testimony of an interested witness provided the testimony is clear, direct and positive and there are no circumstances tending to discredit or impeach the same. There is an added reason for recognizing the exception when the opposite party had the means and opportunity of disproving the testimony, if it were not true, and failed to do so. On the other hand the basis for recognizing an exception is weakened somewhat when the testimony is such that it could not readily be contradicted if untrue. See James T. Taylor & Son, Inc. v. Arlington Ind. Sch. Dist., 160 Tex. 617, 335 S.W.2d 371; Owen Development Co. v. Calvert, 157 Tex. 212, 302 S. W.2d 640; McGuire v. City of Dallas, 141 Tex. 170, 170 S.W.2d 722.

Fortenberry testified simply that he relied "on the representations made in these letters." After referring to the letters, Thorton stated that "based upon this, since we wanted to close this loan and because if we hadn't we would have lost considerable more money, and the reluctance of Dr. Gevinson to close, or Kirkeby-Natus, I went to New York and acquired these documents." This testimony suggests that Manhattan may have decided to take a chance on acquiring the assignment and closing the loan because any other course would have involved the loss of even more money. According to their brief in the Court of Civil Appeals, they were about to lose almost $750,000.00 owing to subcontractors and materialmen, and that figure evidently does not include the profits they would have lost.

Thornton has been practicing law for over 15 years, and Fortenberry holds a responsible position with Manhattan. Both must have known that an assignment can be given as collateral security rather than

4. Gevinson, who is a dentist and not a lawyer, represented himself and the other defendants in the trial court, and the record is unclear in several respects.

for the purpose of passing title, and that lienholders occasionally take over the management of their security without foreclosing the liens. The two documents they received in New York that would have effectively deprived Gevinson of any control over partnership affairs were his resignations as general partner and as officer and director of 21 Properties, Inc., and neither of these instruments was dated. The assignment from Kirkeby-Natus to Thornton, Trustee, makes it clear, moreover, that the various documents reflected nothing except a security transaction. There is some basis for questioning then whether persons with the training and experience of Thornton and Fortenberry would have made a detrimental change of position in reliance on the letters and without further investigation.

Their dealings in New York were with Altman, who had written FHA some three weeks before that there had been no change in the ownership of the partnership interests. They evidently discussed a number of matters with him, because Thornton learned at the time of the prior lien held by Wallace and of the option entitling Kirkeby-Natus to acquire the same. In view of the language of the assignment executed by Kirkeby-Natus, it seems likely that they also discussed the nature of the interest owned by Kirkeby-Natus. In this connection, we observe that Thornton's notes of the transaction show that he "obtained release of interest from Kirkeby-Natus in 21 Turtle Creek Square."

Thornton and Fortenberry also had numerous conferences with the officials of FHA. Before FHA would allow the loan to be closed, it required Manhattan to indemnify it against any liability to Gevinson. In view of these circumstances, it seems likely that the nature of the interest held by Kirkeby-Natus was discussed at one or more of the conferences with FHA. Neither Fortenberry nor Thornton undertook to say what, if anything, they learned from FHA or Kirkeby-Natus concerning the title of the latter to the partnership interests.

Finally, the record is unclear as to what transpired at the meeting in July, 1964. According to Fortenberry, Gevinson said he could not sign the cost certification because he had assigned his interest to Kirkeby-Natus. Fortenberry then asked Weniger if he was willing to sign, and Weniger replied that he wasn't sure he would accept the assignments. Thornton testified that Fortenberry requested that the true owner stand up and no one responded. This is disputed by Gevinson, who states that he did stand up, declared that he was the true owner, and explained the steps that should be taken before he would be in position to sign the certification. Plaintiffs point to evidence raising doubts as to Gevinson's credibility and indicating that his business practices may not have always measured up to the standards of the market place, but these are matters to be considered by the trier of fact. In our opinion the case does not fall within the exception to the general rule, and detrimental change of position in reliance on the letters and other conduct of Gevinson is not conclusively established by the evidence.

The $1,104,881.72 money judgment awarded to Manhattan consists of the following:

| | |
|---|---:|
| Advances to Gevinson Associates and Mardal that were not repaid out of proceeds of permanent loan | $ 230,863.00 |
| Advances found by the jury to have been made to or on behalf of TCS, Ltd. prior to closing of permanent loan | 429,518.72 |
| Advances found by the jury to have been made to or on behalf of 21 TCS, Ltd. to cover operating deficits after closing of permanent loan | 444,500.00 |
| Total | $1,104,881.72 |

The $444,500.00 represents advances made to cover operating deficits incurred while the building was managed by plaintiffs through Thornton, Trustee, in his asserted capacity as President, director, and sole stockholder of 21 Properties, Inc., which he claimed to be the sole general partner of 21 TCS, Ltd. If it should finally be determined that Thornton is an interloper, plaintiffs may not be entitled to recover some or all these advances and their right to the other amounts included in the trial court's judgment could be affected by an accounting with the true owner of the building. It is our opinion that the entire cause should be remanded for a new trial, and we do not attempt to consider Manhattan's points of error here or Gevinson's points of error in the Court of Civil Appeals attacking the money judgment and the fixing of a lien on the real estate.

The judgments of the courts below are reversed, and the entire cause is remanded to the district court for a new trial.