CITY OF SAN ANTONIO, acting By and Through its WATERWORKS BOARD OF TRUSTEES, Appellant,

v.

Ralph Wayne THEIS, Appellee.

No. 1007.

Court of Civil Appeals of Texas, Tyler.

July 21, 1977.

Rehearing Denied Aug. 18, 1977.

Richard A. Flume, Sawtelle, Goode, Davidson & Troilo, San Antonio, James M. Parker, City Atty., San Antonio, for appellant.

James G. Murry, San Antonio, for appellee.

DUNAGAN, Chief Justice.

This is a suit involving wrongful suspension of employment. Appellee Ralph Wayne Theis, plaintiff below (hereafter called "Theis"), filed suit against the appellant City of San Antonio, acting by and through its Water Works Board of Trustees (hereafter called "appellant"), seeking damages for wrongful suspension and temporary and permanent injunctive relief in the form of a full reinstatement to his former position and salary. At a hearing on the temporary injunction, pursuant to agreement between the parties, the court entered its temporary injunction ordering appellant to pay Theis's salary while he continued under suspension. Thereafter appellant filed its original answer alleging misconduct and incompetency on Theis's part in the pursuit of his job responsibilities, said misconduct chiefly consisting of unsubstantiated payments and overpayments to contractors doing construction work for appellant's water board.

Trial was before a jury who, in answer to special issues, found that appellant did not have probable cause to suspend Theis without pay (in answer to Special Issue No. 1); that as a result of the wrongful suspension Theis suffered actual damages of $62,500.00 (in answer to Special Issue No. 2); that appellant acted with malice in suspending Theis (in answer to Special Issue No. 3); and that exemplary damages of $87,500.00 should be awarded against appellant (Special Issue No. 4). Defendant thereafter filed its motion for judgment n. o. v. The trial court partially granted said motion, and in its judgment recited that there was no evidence to support the jury's findings of malice and exemplary damages and that the jury's answers to Special Issues Nos. 3 and 4 should be disregarded. Otherwise, the court entered its judgment in favor of

Theis and against appellant upon the jury's answers to Special Issues Nos. 1 and 2 in the amount of $62,500.00 with interest and costs in favor of Theis. The court's judgment also permanently enjoined appellant from doing any act or engaging in any conduct designed or intended to prevent Theis from pursuing his position with appellant.

After appellant made its motion and amended motion for new trial and the court's overruling of same, appellant timely perfected this appeal, alleging twenty-one points of error. Theis presents counterpoints in reply to appellant's points of error, and also presents two cross points complaining of the court's action in disregarding the jury's answers to Special Issues Nos. 3 and 4.

We reverse and render.

Theis's position was supervisor of the construction inspection division of the Water Works Board of San Antonio, a public utility owned by the City of San Antonio, appellant. The Water Board annually contracts out millions of dollars worth of construction work pursuant to public bidding. The construction work is done under the general conditions and specifications of Water Board contracts which Theis and contractors were to follow. The general conditions permit extra work to be done in certain situations pursuant to the execution of change orders. Theis was responsible for negotiating change orders, and initiating payment for extra work done pursuant to authorized change orders. Theis's job included confirming that all work was performed and the materials furnished according to Water Board specifications prior to approving the partial payment or final payment certificates.

Theis held his position of supervisor from April 1973 until November 1975. During a period of approximately eighteen months, Theis approved payments to certain contractors which his superiors soon thereafter contended were unauthorized. Because of the amount of these alleged overpayments indicated by the Water Board's internal audit, the Water Board's management commenced an investigation for possible dishonesty in connection with these overpayments.

On November 19, 1975, Theis was handed a letter by Hugh R. Anderson, director of the engineering department, in which Theis was given notice of his suspension without pay "for a period not to exceed six weeks in accordance with the provisions of Section V.D.7.c., 'Theft of City Water Board or Employee Property or other Forms of Dishonesty' and Section V.E.1.e(3), 'Disciplinary Layoff or Suspension Without Pay' of the City Water Board Personnel Manual." The letter informed Theis that a preliminary investigation indicated that "in respective cases overpayments, falsification, or alterations of change orders and final payment certificates" had been made in jobs individually listed by number in the letter. During the suspension effected by the letter an investigation was to be made in continuance of the preliminary investigation which preceded the suspension.

After the suspension, the Water Board ordered a full scale investigation by Ernst & Ernst, an auditing firm, which conducted an independent audit. The audit was completed on January 13, 1976.

On November 26, 1975, Theis delivered to Anderson an "Inter Office Memorandum" which set out Theis's answers and explanations to each of the jobs put in issue by the November 19th letter. Theis received no reply to this memorandum from appellant. In the meantime, Theis retained counsel who, on December 4, 1975, requested the Water Board in writing to send in detail the complete charges concerning the Water Board's accusations of dishonesty against Theis. On December 11, 1975, Anderson, in behalf of appellant, answered counsel's letter stating that Theis had not yet been charged with theft. Anderson also gave counsel specific information concerning the accusations stemming from the jobs in question, and notified counsel that Theis's alleged acts were in violation of state statutes.

By letter dated December 30, 1975, appellant advised Theis that his suspension without pay was being extended for an addition-

al period not to exceed fifteen days pending further and thorough investigation of the allegations.

On January 15, 1976, Anderson, in behalf of appellant, notified Theis by letter that the audit report of Ernst & Ernst was being turned over to the appropriate law enforcement authorities at that time, and thereby continued the suspension without pay indefinitely while the matter was reviewed by local law enforcement authorities. The letter also notified Theis that his right to file a formal employee grievance was available to him.

On January 19, 1976, Theis filed this suit for damages and injunctive relief, with a hearing for temporary injunction set for January 24, 1976.

On Saturday, January 24, 1976, at 4:00 o'clock P.M., appellant's employees, Toler and Anderson, went to Theis's home and presented him with a letter, notifying him that he was being discharged. The letter covered in detail the grounds for discharge.

At the hearing on the temporary injunction, an agreement was reached between the parties that Theis would be reinstated as an employee as if he had not been discharged; that he be continued on suspension; that he be paid all wages and other benefits accrued since November 19, 1975; that appellant continue to pay Theis all wages and other benefits as accrued through final disposition of said cause on its merits; that a writ of injunction issue in accordance with the order; and that the case be specially set for trial on the merits for March 1, 1976.

Appellant in its points of errors nos. 1–8 complains of the permanent injunction granted by the court. Theis states under his counterpoint one in reply to appellant's points of error nos. 1–8 "that he wishes to and does now abandon his plea for permanent injunction and the relief granted him thereon by the Trial Court; that . . . this Court should order the Trial Court to reform its judgment to conform with the submission herein of Appellee." In compliance with this waiver the judgment of the trial court is reformed and the permanent injunction granted by the trial court in favor of appellee is hereby rescinded.

Appellant in its point of error no. 12 alleges that "The trial court erred in overruling the defendant's [appellant] first supplemental motion for judgment notwithstanding the verdict because the uncontradicted evidence and appellee's judicial admission showed as a matter of law that defendant had probable cause to suspend the plaintiff. (Defendant's First Supplemental Motion for Judgment Non Obstante Veredicto, Par. XII. Tr. 122)."

Theis's counterpoint five in reply to appellant's point of error contends that "Appellant is precluded from raising as error this point as it was not assigned as error in Appellant's first supplemental motion for new trial; nor did Appellant object and except to the submission of this issue prior to the submission of the Court's charge to the jury."

■ Tex.R.Civ.P. Rule 301 provides that ". . . upon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like motion and notice, disregard any Special Issue Jury Finding that has no support in the evidence." There is no prerequisite to appellate review that the grounds presented in a rule 301 motion must be repeated as assignments of error in a motion for new trial. *Wagner v. Foster*, 161 Tex. 333, 341 S.W.2d 887, 890 (1960); Tex.R.Civ.P. 324.

■ There is additionally no requirement that appellant object and except to the submission of a special issue on a "no evidence" basis as a predicate to attacking the same in a motion for judgment non obstante veredicto. 4 McDonald "Texas Civil Practice" sec. 17.32, at pages 208–209.

■ The record is clear that appellee falsified certain payments to contractors in the form of payment certificates and work entries. Appellee himself judicially admitted doing so in the following testimony concerning a particular job done by the R.

L. Jones Company under contract involving work done at a street intersection:

"Q. When the contractor reached that intersection, there was a disagreement about whether he was going to bore under the street, and he asked to be compensated extra for putting tunnel liners in; is that right?

"A. Yes, sir.

"Q. And you agreed that he could put in tunnel liners which weren't provided for in the specs, and you negotiated a price with him to put them in, right?

"A. Yes, sir.

.    .    .    .    .

"A. Yes, the negotiated price was $57.00 a linear foot.

"Q. Now, when it came time to prepare—so, the change order was prepared by you that he would be paid extra for this, right?

"A. Yes, sir.

"Q. It was your judgment, then, that he was not to follow the specifications, but to put in tunnel liners?

"A. YES, SIR, THIS WAS AN EXCEPTION.

"Q. Now, when it came time to pay the contractor, the amount of $57.00 a foot didn't appear on the payment certificate, did it?

"A. No, sir.

"Q. You prepared the payment certificate and approved it for payment, showing a different figure to be paid to the contractor; isn't that correct?

"A. Yes, sir.

"Q. Didn't you, in fact, show $27.00 a foot?

"A. Yes, sir.

"Q. In doing that, you showed an entry for something called select back-fill or sand for another $20.00 which was never actually delivered to the job; is that right?

"A. Yes, sir. That was a part of the payment for the tunnel liner.

.    .    .    .    .

"Q. You showed $37.00 a foot instead of $57.00 a foot, and you showed an extra $20.00 a foot on something else that was never delivered; is that right?

"A. Yes, sir.

"Q. In fact, the specifications didn't call for any sand or back-fill to be paid for as extra, did it?

"A. No, sir.

"Q. And there wasn't, in fact, any sand or back-fill delivered to that job, was there?

"A. No, sir.

"Q. And yet, you prepared a certificate which paid the contractor for a certain quantity of select back-fill and sand?

"A. Yes, sir."

In another job requiring installation of fire hydrants by the R. L. Jones Company, the testimony is as follows:

"Q. .  .  . This was a job in which the contractor was to install thirteen fire hydrants; is that correct?

"A. Yes, sir.

"Q. And he was paid for installing thirteen fire hydrants?

"A. Yes, sir.

.    .    .    .    .

"Q. And isn't it correct that there was an extra payment of $660.00 for fire hydrants that were not delivered—that were not installed, and an additional $1,800.00 for the taps for those fire hydrants that were not installed?

"A. Yes, sir.

"Q. And you approved the payment certificate for the payment of the thirteen fire hydrants, right?

"A. Yes, sir.

"Q. How many were actually installed?

"A. There were ten installed on the job.

.    .    .    .    .

"Q. Wasn't the contractor paid for the installation of thirteen?

"A. Yes, sir.

"Q. Mr. Theis, how can you be paid for fire hydrants that aren't installed and aren't there?

"A. There was a delay in getting the last three fire hydrants for the particular job, because they were specially ordered; and, evidently, they hadn't arrived by the time that the final payment certificate was issued on the job.

"Q. By the time that you issued the payment certificate, did you check to see if all thirteen had been installed?

"A. No, sir, I didn't go out and visually check all the jobs.

"Q. Did you check the plans to see if the inspectors had shown that the fire hydrants had been installed?

"A. No, sir.

"Q. To this date, have those fire hydrants been installed?

"A. I don't know if they have or not.

.   .   .   .   .

"A.   .   .   .   immediately after my suspension, I drove by the job and there were three fire hydrants missing on it."

Another job done under appellee's supervision involved the execution of change orders for extra work. The testimony concerning it is as follows:

"Q. So, when this $13,650 worth of extra work was agreed upon in this Cody Street job, it was up to you and the people under your supervision to see that it was done before it was paid for; right?

"A. Yes, sir.

"Q. Well, sir, are you able to say, under oath, that that work was done before it was paid for?

"A. No, sir.

"Q. Yet, you signed a payment certificate in each of these instances that total $13,650 approving payment for that work?

"A. Yes, sir, based on the assumption that the payment certificate was correct and the work had been done.

"Q. Yet, there are no indications on the as-built plans that this work was actually done, are there?

"A. No, sir.

"Q. Did you check the as-built plans before you paid the contractor?

"A. No, sir.

.   .   .   .   .

"A. No, I didn't check all the jobs—or I didn't check a lot of the jobs against the as-built plans.

"Q. Isn't it a fact, Mr. Theis, that at least seven of these intersections, that no wet connections were actually installed and no what's called tapping sleeves were installed, which were provided for in the contract?

"A. Yes, sir.

"Q. And the contractor had already been paid for that in the original contract, right?

"A. Yes, sir, for that work.

"Q. All right, sir. And yet, he was paid for wet connections on top of that, that was never done?

"A. Yes, sir. I said that I relied upon the payment certificates filled out by the payment estimator and the inspector.

.   .   .   .   .

"Q. Have you ever caught this clerical person in any mistakes?

"A. Yes, sir, on occasion.

"Q. Did you check him out on this particular computation to see if there were any mistakes made?

"A. No, sir."

The above testimony constitutes a judicial admission by appellee that he committed certain acts which constitute falsifications of government records or job-related misconduct. "A judicial admission consists of a formal statement, either by a party or his attorney, in the course of a judicial proceeding which removes an admitted fact from the field of controversy." *Mobil Oil Co. v. Dodd*, 515 S.W.2d 351, 353 (Tex.Civ. App.—Corpus Christi 1974, no writ). See *Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 466 (Tex.1969). If these acts which appellee judicially admitted constitute a serious violation of his employment contract, they would extinguish appellee's right to recover for wrongful suspension, if suspension was warranted by the doing of these acts.

Our determination of this case therefore hinges upon the question of whether as a matter of law appellant had probable cause to suspend plaintiff. In doing so we must review the job duties and responsibilities of appellee in light of the conditions contained in the City Water Board employee handbook.

The formal job description of appellee's position, Supervisor of the Construction Inspection division, involved the following typical duties:

"1. Supervises the personnel and activities of a group representing the City Water Board on construction contracts . . . to assure conformance to contract specifications.

"2. Coordinates construction projects with contractor . . . by conducting . . . detailed inspections to . . . record existing irregularities . . . .

"3. Approves certificates for partial and final payments to contractor.

"4. Negotiates contract change orders resulting from field changes made to original plans and establishes costs associates with these changes . . . .

"6. Visits construction projects and confers with construction inspectors on matters such as progress of job according to schedule, field changes made and required, . . . and the like.

"7. Inspects in conjunction with Construction Inspector-Senior completed projects for discrepancies and insures any discrepancies found are corrected prior to initiating final payment.

"10. Maintains or directs the maintenance of various maps and records such as . . . records of contract work, payment record, inspector estimates, and the like.

"11. Performs related duties as required."

A City Water Board Handbook entitled "Employee Handbook on Employee Grievance and Discipline-Discharge For Cause" sets out generally recommended disciplinary steps. Under the "Discipline-Discharge For Cause" provisions, the following provisions appear:

"C. Justifiable Cause for Employee Discipline or Discharge:

6. Willful violation of City Water Board Rules.

8. Various acts of dishonesty or misconduct including . . . falsifying of work records . . . ..

10. Incompetence towards the work situation which would include carelessness, defective work . . . ..

"D. Discipline and Discharge Standards and Practices:

1. The type of disciplinary action taken will be related to the circumstances surrounding the actions or omissions of the employee . . . ..

2. In cases of serious offenses such as stealing of City Water Board properties . . . a supervisor is *not* required to follow a progressive series of disciplinary actions . . . ..

7. The form of discipline used will depend upon the circumstances surrounding the situation . . . .. [G]eneral guidelines . . . are provided as guides and are not intended to restrict the actions of supervisors nor to define the disciplinary measures to be taken in any specific instance.

c. THEFT OF CITY WATER BOARD OR EMPLOYEE PROPERTY OR OTHER FORMS OF DISHONESTY—These offenses normally result in an immediate suspension in order for

an investigation to be made. Depending on the results of the investigation the employee may be discharged, continued on suspension while the matter is turned over to local law enforcement authorities or returned to duty . .."

The tenor of the above rules in our opinion is that in situations where serious violations appear to have occurred, a supervisor is not required to follow a progressive series of disciplinary actions. The record shows that concerning jobs under appellee's supervision a total amount of $36,479.00 was paid for goods and services which were either not received or that some other goods and services were received and paid for in violation of City Water Board and job contract rules. The record also shows $93,482.00 was paid for goods and services which were received but the reason for payments to contractors for specific items are questionable. The expense for some of the items were to have been paid by the contractors as required by City Water Board and job contract rules. The fact that such large expenditures were in question gives us little doubt that a full and proper investigation was required. The provisions of City Water Board's "Employee Handbook on Employee Grievance and Discipline Discharge For Cause" we think allowed appellee's supervisors in this situation the right to suspend appellee while an investigation was made.

As shown earlier in the description of appellee's job, he was in a supervisory role, and either had control over or maintained or directed "the maintenance of various maps and records such as . . . records of contract work, payment records, inspector estimates, and the like." An investigation into the subject irregularities required a detailed analysis of records under appellee's control. The amount of money in question necessitated an investigation that could only be properly conducted in appellee's absence from the job to assure preservation of the records.

Appellee contends that the section of the handbook under which he was suspended required a dishonest act. An investigation here was needed to determine if appellee's acts were dishonest or incompetent or both. We think the purview of the section allegedly requiring a dishonest act covers such a situation as this one. Appellee himself admitted falsifying a governmental record which in itself is a violation of Tex. Penal Code Ann. sec. 37.10 (1974).

The record is clear that certain overpayments were undisputedly made and that other serious irregularities existed. This, plus appellee's judicial admissions, we think, establish as a matter of law that appellee's superiors had probable cause to suspend appellee pending investigation. Where certain facts are undisputed, the trial court may disregard the jury's findings to a special issue and render judgment on the undisputed evidence. *Wooley v. West*, 391 S.W.2d 157 (Tex.Civ.App.—Tyler 1965, writ ref'd, n. r. e.); Tex.R.Civ.P. 301.

We have considered appellant's remaining points of error and find them to be without merit. They are accordingly overruled.

Appellee presents two cross points of error alleging that the court erred in disregarding the jury's findings that appellee was entitled to recover exemplary damages in the amount of $87,500.00. In light of our holding that as a matter of law appellant had probable cause to suspend appellee, appellee's cross points are overruled.

For the reasons stated, the judgment of the trial court that appellee have and record actual damages in the amount of $62,500.00 from appellant is reversed and judgment is hereby rendered that appellee take nothing from appellant.

Reversed and rendered.