NO. 12-02-00056-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


IRA LEE HOLT, CURTIS HOLT AND
§
 APPEAL FROM THE 145TH

DENNIS HOLT, INDIVIDUALLY AND

AS REPRESENTATIVES OF THE

ESTATE OF MURVEL HOLT,

APPELLANTS


V.
§
 JUDICIAL DISTRICT COURT OF




VIJAY R. POKALA, M.D.,

APPELLEE
§
 NACOGDOCHES COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellants Ira Lee Holt, Curtis Holt, and Dennis Holt, individually and as representatives of
the estate of Murvel Holt ("the Holts") challenge the trial court's grant of a take-nothing judgment
in favor of Appellee Vijay R. Pokala, M.D. ("Pokala"). In one issue, the Holts contend that the trial
court erred in granting the take-nothing judgment because Pokala's judicial admissions barred any
defense asserted by Pokala during trial. We affirm.


Background

 On November 13, 1996, Murvel Holt saw Dr. Joseph Hooker, a general practitioner in
Center, Texas, complaining of tightness in the throat and chest. Dr. Hooker ordered an
electrocardiogram (EKG), which he found to be normal. Six days later, on November 19, Mr. Holt
once again experienced chest pain and was taken by ambulance to Nacogdoches Memorial Hospital. 
Dr. Laxman Kalvakuntla ("Dr. Laxman") ordered that blood tests be performed and that Mr. Holt
undergo another EKG on November 20.

 The November 20 EKG showed that Mr. Holt had experienced a heart attack at some point
between November 13 and November 20. Also on November 20, an echocardiogram was performed
on Mr. Holt. Dr. Pokala, a cardiologist, evaluated the results of the echocardiogram, and concluded
that Mr. Holt's heart had 1) a mildly dilated left ventricle, 2) a dilated left atrium, 3) mitral
regurgitation, 4) pericardial effusion, and 5) lateral wall hypokinesis with ejection fraction down to
around forty-five percent. Dr. Laxman ordered that Mr. Holt receive topical nitroglycerine in order
to dilate his blood vessels. Dr. Laxman also believed that at that time, Mr. Holt was at risk for
reinfarction, or another heart attack.

 On November 22, Dr. Laxman ordered Mr. Holt to undergo a pharmacologic stress test in
order to find out whether Mr. Holt had heart artery disease. Dr. Laxman's notes from the stress test
indicate that Mr. Holt had "chest pain during the hospitalization with abnormal electrocardiogram." 
 The first time Dr. Pokala saw Mr. Holt was during the evening of November 22, around 6:30
or 7:30 p.m. Dr. Pokala had learned from Dr. Laxman that Mr. Holt came to the hospital with
recurrent chest pain and was admitted for chest pain. Dr. Pokala read the results of Mr. Holt's
echocardiogram and determined that Mr. Holt needed a cardiac catheterization. Mr. Holt told Dr.
Pokala that he was "agreeable, but he would talked [sic] to family again in the morning." At that
time, Dr. Pokala did not have available the results of the November 20 EKG. 

 On Saturday, November 23, Dr. Pokala performed the cardiac catheterization on Mr. Holt
and found a "high-grade stenosis [narrowing] of the left anterior descending coronary artery in the
proximal portion at the origin of the diagonal branch," and a "99% stenosis in the mid-portion and
total occlusion [blockage] beyond that" of the same artery. After Dr. Pokala performed the
procedure, his conclusions were


 [h]ypertensive occlusive vascular disease, coronary sclerosis of left anterior descending coronary
artery and obtuse marginal branches of the circumflex as described. The patient is not a candidate for
coronary artery bypass grafting surgery. (1) In view of his severe disease, the left anterior descending
coronary artery could be bypassed; however, the risk of bypass surgery in this person will be high. 
If we are going to open up with the balloon and place stent in the left anterior descending coronary
artery, he may do well. Patient is advised about the same. Patient has agreed. He will be taken to the
Cardiac Catheterization Laboratory for percutaneous transluminal coronary angioplasty (2) and stent
implantation. 



Dr. Pokala believed that Mr. Holt's condition was "non-emergent"; therefore, Dr. Pokala treated the
procedure as "elective" and scheduled the angioplasty and stent implantation for Monday, November
25. Dr. Pokala believed that the extra day between the procedures would give him time to review
everything, talk to Mr. Holt's family and other physicians, and pre-medicate and pre-treat Mr. Holt
before the procedure.

 At 12:38 p.m. on Sunday, November 24, Mr. Holt complained of pain radiating into his neck,
shoulders, and arms. At 4:42 p.m., Mr. Holt died from an "acute myocardial infarction," or heart
attack.

 On December 31, 1998, the Holts filed suit against Michael Taylor, M.D., Joe B. Hooker,
M.D., Prabhakar Guniganti, M.D., Laxman Kalvakuntla, M.D., and Vijay R. Pokala, M.D., alleging
that the "Defendants committed certain acts and omissions which constitute negligence, and which,
in turn, proximately caused injury, loss and eventually death, to Murvel Holt. . . ." 

 The Holts filed a notice of non-suit with regard to Dr. Guniganti on July 23, 2001, and the
trial court signed the order of non-suit on July 24. The Holts' case went to trial against the remaining
defendants on October 29. On November 1, the jury rendered a unanimous take-nothing verdict,
finding no negligence in favor of Drs. Pokala, Laxman, Hooker, and Taylor. 

 On November 26, the Holts filed notices of non-suit with regard to Drs. Hooker and Laxman;
the trial court granted the nonsuits, with prejudice, on November 28. On December 6, the Holts filed
a motion for new trial, which the trial court overruled on January 17, 2002. The Holts later filed a
notice of appeal on February 15.

 On appeal, the Holts contend that testimony from Dr. Pokala amounted to a "confession and
judicial admission," thereby relieving the Holts of proving negligence and barring Dr. Pokala from
disputing negligence. 


Did Dr. Pokala's Testimony Amount to a Judicial Admission?

 The Holts argue that Dr. Pokala's testimony on cross-examination constitutes a judicial
admission of Dr. Pokala's negligence because he knew that Mr. Holt was "at high risk for another
heart attack." Therefore, the Holts contend, Dr. Pokala should have taken further measures to save
Mr. Holt's life. The Holts point to the following exchange between Dr. Pokala and their counsel to
illustrate the alleged judicial admission:


 Q: You knew Mr. Holt had slow blood flow through his LAD [left anterior descending coronary
artery]?


 A: Yes, sir.


 Q: -all right, Mr. Holt - You knew Mr. Holt had slow blood flow through his LAD?


 A: Yes, sir.


 Q: And that placed him at risk for recurrent heart attack, and the risk was a high risk, correct?


 A: After a Q-wave MI [myocardial infarction], usually the risk is not as much as non-Q-wave
myocardial infarction.


 Q: Let's go to your deposition.


 A: Yes, sir.


 Q: Page 107.


 A: Yes, sir.


 . . . .


 Q: Again, you're under oath.


 A: Yes, sir.


 Q: - when you gave these answers?


 A: Yes, sir.


 Q: And you're standing by them, right?


 A: Yes, sir.


 Q: All right. "I think the question that started us off was, isn't it true that we have slow blood
flow in the LAD like Mr. Holt had." And the answer is? Line 13, 107.


 A: "Yes."


 Q: "This current clinical picture that there is a high risk for a recurrent heart attack. And isn't
that just a true statistic? That's the truth, isn't it?"


 A: "It can close. It can close. That's one thing. But can it cause another heart attack? Yes,
there is a chance, but not everybody who had a heart attack and who had a narrow vessel that
closed, they already had a heart attack. It can close several times, open several times. It may
not cause any trouble."


 Q: "But the risk is there, certainly?"


 A: "Yes, the risk is there."


 Q: "And the risk is a high risk?"


 A: "The risk is a high risk, yes."


 Q: All right. Turn to page 130.


 A: Yes, sir.


 Q: Doctor, in spite of this high risk that Mr. Holt might reinfarct before you - you didn't -
excuse me. In spite of the fact that he was high risk, you didn't anticipate that he might
reinfarct before you had the chance to do the PTCA on Monday, correct?


 A: Yes, sir.


 Q: So, he had a high risk, but you just didn't anticipate the chance of reinfarction, didn't
anticipate it, didn't see it coming, correct?


 A: According to what he said, yes, I have to say, yes. Yes, sir.


 Q: And the plans you made for Mr. Holt did not take into account the possibility that he could
have had a severe reinfarction before he got to the Medical Center on the 25th, correct?


 A: You have to again rephrase that question, sir.


 Q: You bet. The plans you made for Mr. Holt - 


 A: Yes, sir.


 Q: - to treat him on the 23rd, didn't take into account the possibility that he could have a severe
reinfarction before you got him over there for the stent implementation, correct?


 A: We talked about that, yes, sir.


 Q: Well, page 131. Let's look at it real close here.


 A: Yes, sir.


 Q: Line 12.


 A: Yes, sir.


 Q: "The plans you made for Mr. Holt on the 24th, did not take into account the possibility that
he could have a severe reinfarction before he got to the Medical Center on the 25th. Would
that be fair to say?" What's your answer?


 A: I think it may be a typo -


 Q: What's your answer?


 A: I said, "Yes, sir."


 Q: All right.



 The Holts argue that Dr. Pokala's decision to wait and perform the CABG or PTCA
procedures on Mr. Holt on Monday, November 25, instead of immediately performing them on
Saturday, November 23, violated the standard of care because Dr. Pokala knew Mr. Holt was "high-risk." Stated differently, the Holts contend that Dr. Pokala's decision, according to their expert, "to
treat Mr. Holt as an elective candidate for PTCA, rather than an emergent or high-risk candidate for
PTCA or CABG surgery, was a violation of the standard of care." 

The Law of Judicial Admissions

 "A party's testimonial declarations which are contrary to his position are quasi-admissions." 
Mendoza v. Fidelity & Guaranty Ins. Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980). Those
"quasi-admissions" are merely some evidence, and are not conclusive upon the admitter. Id. The
trier of fact decides the weight to be given such admissions. Id. Quasi-admissions are to be
distinguished from the true judicial admission, which is a formal waiver of proof usually found in
pleadings or the stipulations of the parties. Id. A judicial admission is conclusive upon the party
making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the
admitting party from disputing it. Id. (citing Gevinson v. Manhattan Constr. Co. of Oklahoma, 449
S.W.2d 458, 467 (Tex. 1969)). In United States Fidelity & Guaranty Co. v. Carr, 242 S.W.2d 224,
228 (Tex. Civ. App.- San Antonio 1951, writ ref'd), the court noted as follows: 


 "It is of the nature of an admission, plainly, that it be by intention an act of waiver, relating to the
opponent's proof of the fact, and not merely a statement of assertion or concession, made for some
independent purpose; in particular, a statement made for the purpose of giving testimony is not a
judicial admission." Wigmore on Evidence § 2594 (1934). Mere testimony, though it come from
a party, is not "by intention an act of waiver." A witness is not selling something or giving something
away, but simply reporting something. 



Carr, 242 S.W.2d at 228.

 As a matter of public policy, however, a party's testimonial quasi-admission will be treated
as a judicial admission and therefore preclude recovery if it meets the requirements set out in Griffin
v. Superior Ins. Co., 338 S.W.2d 415, 419 (Tex. 1960) and Carr, 242 S.W.2d at 229:



 That the declaration relied upon was made during the course of a judicial proceeding.

 That the statement is contrary to an essential fact embraced in the theory of recovery or
defense asserted by the person giving the testimony. 

 That the statement is deliberate, clear, and unequivocal. The hypothesis of mere mistake or
slip of the tongue must be eliminated. If the statement merely contradicts some other portion
of the party's testimony, conclusive effect cannot be given thereto, but a fact issue is
presented for the determination [of] the jury or the judge sitting without a jury as in the case
of an ordinary witness.

 That the giving of conclusive effect to the declaration will be consistent with the public
policy upon which the rule is based.

 That the statement is not also destructive of the opposing party's theory of recovery. In other
words, the declaration must be one relating to a fact upon which a judgment in favor of the
opposing party may be based.




Carr, 242 S.W.2d. at 229. The public policy underlying this rule is that it would be unjust to permit
a party to recover after he has sworn himself out of court by clear, unequivocal testimony. Id. 

Analysis

 A plaintiff in a medical malpractice case must prove 1) a physician's duty to act according
to a certain standard, 2) a breach of the applicable standard of care, 3) an injury, and 4) a causal
connection between the breach of care and the injury. Smith v. Mosbacker, 94 S.W.3d 292, 294
(Tex. App.-Corpus Christi 2002, no pet.). The standard of conduct to determine if the duty has been
breached in a physician-patient relationship is that of what a reasonable, prudent physician would
do in a similar medical situation. Grider v. Naaman, 83 S.W.3d 241, 245 (Tex. App.- Corpus
Christi 2002, pet. filed). 

 In the instant case, it is undisputed that Dr. Pokala's testimony was made during the course
of a judicial proceeding. Next, the Holts must establish that Dr. Pokala's statement is contrary to
an essential fact embraced in the theory of recovery or defense asserted by Dr. Pokala. The defense
asserted by Dr. Pokala was that he did what a reasonable, prudent physician would have done under
the same circumstances. Although Dr. Pokala agreed with the Holts' attorney's assertion that Mr.
Holt was at "high risk" for another heart attack, Dr. Pokala maintained throughout the trial that his
actions did not constitute negligence or a deviation from the standard of care. Furthermore, Dr.
Sanford Lubetkin, Dr. Pokala's expert, also agreed that a person like Mr. Holt with "multivessel
disease is at risk for having heart attacks" and that "when a person has had one heart attack it's also
certainly not too far-fetched that they might have another one." Although he agreed with the Holts'
counsel's assertions, Dr. Lubetkin, like Dr. Pokala, also maintained that Dr. Pokala's decision to
perform the CABG or PTCA procedures on Monday was not a deviation from the standard of care. 
Therefore, the Holts have not established that Dr. Pokala's statement was contrary to an essential fact
embraced in the theory of defense asserted by Dr. Pokala.

 The Holts also cannot establish that Dr. Pokala's statements were deliberate, clear, and
unequivocal. Dr. Pokala states that his answer to the question at his deposition, where he agrees that
he did not take into account the possibility that Mr. Holt could have had a severe reinfarction before
the 25th, "may be a typo [typographical error]"; therefore, his answer is not unequivocal. Also, Dr.
Pokala's statement contradicts another portion of his testimony, where he maintains that he thought
that Mr. Holt's condition was "non-emergent"; therefore, Dr. Pokala believed the procedures could
wait until Monday. Dr. Pokala's testimony merely created a fact issue for the jury to decide. The
jury is the sole judge of the credibility of witnesses and the weight given to their testimony. Jones
v. Tarrant Util. Co., 638 S.W.2d 862, 866 (Tex. 1982). The jury could have chosen to believe the
Holts' contention that Dr. Pokala deviated from the standard of care and did not do what a
reasonably prudent physician would have done under the same circumstances; however, the jury
chose to side with Dr. Pokala. 

 The instant case is markedly different from the Naaman case, where Dr. Naaman testified
that he cut the brachial plexus nerve roots C8 and T1, believing that he was in the stellate ganglion
area and had cut a stellate ganglion rather than a brachial plexus nerve. Naaman, 83 S.W.3d at 245. 
It was undisputed at trial that a surgeon who cuts the brachial plexus nerve roots, when he thinks that
he is in the area of the stellate ganglion, falls below the standard of care. Id. Both Dr. Naaman and
his expert agreed that Dr. Naaman's actions fell below the standard of care. Id. The court held that
Dr. Naaman's testimony amounted to a judicial admission because 


 [t]he testimony of appellee and his expert admitting appellee's surgery was below the applicable
standard of care was deliberate, clear, and unequivocal, although contrary to an essential unproven fact
embraced in the theory of defense asserted by appellee, and not destructive of appellant's theory of
recovery. . . . The judicial admissions made the proof of liability part of the appellant's cause of action
conclusive as a matter of law, and jury question number one should not have been submitted to the
jury. 



Naaman, 83 S.W.3d at 246. 

 Here, unlike in Naaman, neither Dr. Pokala or Dr. Lubetkin testified that Dr. Pokala's
decision to wait until Monday to perform the procedures deviated from the standard of care. 
Although the Holts contended that such a decision deviated from the standard of care, that assertion
was heavily defended by Dr. Pokala, and nowhere in the record did he admit that such a decision
deviated from the standard of care. 

 The Holts cannot establish that Dr. Pokala's quasi-admissions can be converted into judicial
admissions which are conclusive as a matter of law; therefore, the Holts' issue is overruled.


Conclusion

 Dr. Pokala's testimony did not amount to a judicial admission which would relieve the Holts
of proving that Dr. Pokala deviated from the standard of care and did not do what a reasonably
prudent physician would have done. Therefore, the trial court's judgment is affirmed.


 DIANE DEVASTO 

 Justice

Opinion delivered October 22, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.


(PUBLISH)
1. Coronary artery bypass grafting ("CABG") is bypass surgery where a surgeon uses an artery or vein to
create a new blood flow path around an artery that is blocked. 
2. Percutaneous transluminal coronary angioplasty ("PTCA") is a procedure where a balloon catheter or
other implement is introduced into the artery to restore a normal blood flow to the part of the heart that the artery
serves. A balloon is introduced through an artery in the leg and is pushed up into the arteries of the heart, where the
balloon is inflated to create a better opening for blood to flow through. Stents are small metal devices placed in the
cleared artery to help keep it open for blood flow.